ALLEN PEN COMPANY, INC.,
Plaintiff, Appellant,

v.

SPRINGFIELD PHOTO MOUNT COM-
PANY, INC., Defendant, Appellee.

No. 80–1432.

United States Court of Appeals,
First Circuit.

Argued March 4, 1981.

Decided June 26, 1981.

Sumner J. Chertok, Boston, Mass., for plaintiff, appellant.

Robert G. Bone, Boston, Mass., with whom John M. Kahn and Hill & Barlow, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, Chief Judge, BREYER, Circuit Judge, and WYZANSKI, Senior District Judge.[*]

BREYER, Circuit Judge.

This case presents questions similar to those recently decided by the Supreme Court in *J. Truett Payne Co. v. Chrysler Motors Corp.*, —— U.S. ——, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). Can a private plaintiff, like a government plaintiff, win a Robinson-Patman Act case simply by showing that the Act's substantive standards have been violated; or must he show more? The government can win a Robinson-Patman Act § 2(a) case, for example, by showing that a defendant seller has "discriminate[d] in price between purchasers of commodities of like grade and quality ... where the

effect of such discrimination *may* be to lessen competition substantially...." 15 U.S.C. § 13(a). (Emphasis added.)[1] The private plaintiff, however, must also satisfy the test of Clayton Act § 4, which grants private rights of action only to those "who *shall* be injured in ... business or property" by a violation of the antitrust laws. 15 U.S.C. § 15. (Emphasis added.)[2] The Supreme Court held that this latter provision imposes a stricter test: A private treble-damage plaintiff "must make some showing of actual injury" attributable to a violation of the Robinson-Patman Act. *J. Truett Payne Co. v. Chrysler Motors Corp.*, —— U.S. at ——, 101 S.Ct. at 1927. Following *Truett Payne*, and after reviewing the record, we affirm the district court's directed verdict for the appellee seller.

I.

Appellant Allen Pen sued appellee Springfield claiming that it was the victim of several instances of unlawful discrimination involving prices, promotional facilities and other services.[3] After all evidence was presented, the district court did not submit the case to the jury, but, instead, directed a verdict for appellee. On appeal, we view the evidence in a light most favorable to appellant, giving it the benefit of all reasonable inferences without neglecting uncontradicted evidence introduced by appellee. *Carlson v. American Safety Equipment Corp.*, 528 F.2d 384, 385–86 (1st Cir. 1976). Our review of the record under this standard indicates the following.

---

[*] Of the District of Massachusetts, sitting by designation.

[1] Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) provides in pertinent part: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...."

[2] Section 4 of the Clayton Act, 15 U.S.C. § 15, provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[3] Sections 2(a), 2(c), 2(d), and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (c), (d), and (e).

Allen Pen is a wholesaler of stationery and school supplies based in Newton, Massachusetts. Springfield manufactures scrap books, photo albums and other similar items. From 1971 to 1975 Allen Pen bought goods from Springfield and resold them. They accounted for a small share—about 1½% to 2%—of Allen Pen's total sales.

Springfield used different price lists to sell the same goods. Springfield and its customers usually referred to these price lists by their colors—green, blue, yellow and white. This fact makes the evidence hard to follow, for the colors changed over time, price lists were amalgamated, and sometimes Springfield referred to a list by a geographical name instead of color. Nonetheless, there is ample evidence that ordinarily there were at least three lists, a "low" price list, a "medium" price list, and a "high" price list, from which Springfield sold the same goods to different customers.

There is evidence from which a jury might conclude that Springfield charged Allen Pen a higher price for its goods than it charged some of Allen Pen's competitors. Before 1970, Allen Pen bought at prices quoted from the low price list—the green list.[4] From 1970 to 1975, however, Springfield quoted Allen Pen prices from its medium list—the blue list.[5] These middle prices were about 5% higher than the low prices. There is evidence that at least two direct competitors of Allen Pen—United Art Company and Economy Paper Company of Rhode Island—received the benefit of lower prices; they may have bought from the low, green price lists between 1971 and 1973. There is testimony that Springfield generally sold from its low price list only to long-established customers and to high-volume purchasers. (And Woolworth's may have received prices lower than on any list.) There is testimony that Springfield sold to small individual storeowner customers from

its high price list—the yellow list—which quoted prices about 5% higher than the middle list.

In addition to the evidence of the different colored lists, there is evidence of other forms of differential pricing. First, Economy and United may have received a 7% discount from their list prices during 1971–1973, while Allen Pen received only a 5% discount from its list price during that period.[6] Indeed, Springfield agreed that it gave a "warehouse allowance" determined on the basis of the volume and frequency of a customer's orders. Kresge, a very large purchaser, may have received a larger discount than Economy or United.

Second, between 1971 and 1975 Springfield required Allen Pen to buy through its sales agent, Duo; Economy did not have to buy through Duo.

Third, Springfield gave a 1% advertising or listing allowance to certain customers, including Allen Pen for the years 1971–1973. During 1974 and 1975, however, Allen Pen did not receive the allowance while its competitors did. This allowance, in the case of its competitor United Art, amounted to $50 for 1974 and $100 for 1975. Other companies received larger allowances, but there is no evidence that they competed with Allen Pen.

There were two other types of unlawful conduct alleged. Allen Pen provided evidence that Springfield gave display racks to some of its competitors but not to Allen Pen. The secretary of one competitor testified that the racks helped it increase its sales of Springfield's products. There is also testimony that the racks supplied Zayre's—whose purchases from Springfield may have dwarfed those of Allen Pen—had a value of $15,000. Finally, Springfield refused to deal with Allen Pen on April 15,

4. The green list was also known as the Springfield East A list.

5. This list was also known as the Holyoke East list. Actually, during 1970 and 1971, it consisted of a single sheet of green paper, but was distinguishable from the "green list" by its prices.

6. In answers to interrogatories, Springfield stated that Economy received a 5% warehouse allowance, but Economy's Vice President, who testified, said it was 7%.

1975. Allen Pen claimed that Springfield was retaliating against it because of its price discrimination charges. Springfield claimed that its action was based upon Allen Pen's payment delinquencies. Regardless, either in July or December, 1975, Springfield resumed sales to Allen Pen.

## II.

Construing the evidence in a light most favorable to Allen Pen, we assume that a jury could have found that Springfield violated the Robinson-Patman Act § 2(a) by selling similar goods to some Allen Pen competitors at lower prices. Springfield claims, however, that a directed verdict was proper because Allen Pen produced no evidence from which a jury could conclude that it was injured by whatever price discrimination occurred. Indeed, the relevant products sold at low prices; the claimed price differences were small, amounting to between 5% and 8% of list price; only two competitors of Allen Pen were shown to have actually received these lower prices and their competition with Allen Pen was geographically limited; Allen Pen remained free to buy similar products from Springfield's competitors. And, above all, Allen Pen's total purchases from Springfield amounted to no more than 1½% to 2% of Allen Pen's sales. Proof of price differences so limited in amount, in time, in area, and in importance (from Allen Pen's business perspective) cannot possibly show, Springfield argues, any *actual* injury to Allen Pen. There is no reason to believe that they could lead the benefitted competitors to lower their prices to the point where they could attract significant numbers of Allen Pen's customers or that Allen Pen's overall profitability could be significantly affected.

Allen Pen responded with three basic arguments. First, it claimed that a showing of a violation of § 2(a) was itself sufficient to show injury. Second, it pointed to other evidence in the record of actual injury. Third, it claimed that Springfield's destruction of relevant records should be considered sufficient to establish injury, or at least sufficient to allow a jury to infer injury. We consider each of these arguments in turn.

■ The first argument—that Allen Pen is entitled to automatic damages in the amount of the price discrimination—was rejected by the Supreme Court in *J. Truett Payne Co. v. Chrysler Motors Corp., supra.* Payne, a former Chrysler dealer, sued Chrysler, alleging that its discriminatory sales incentive programs raised Payne's cost of automobiles above what Chrysler charged favored competitors.[7] Payne argued "that the jury should be permitted to infer the requisite injury and damage from a showing of a substantial price discrimination". —— U.S. at ——, 101 S.Ct. at 1927.

The Court disagreed, stating:

> By its terms § 2(a) is a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination *may be* substantially to lessen competition". As our cases have recognized, the statute does not "require that the discriminations must in fact have harmed competition." *Corn Products Co. v. FTC*, 324 U.S. 726, 742 [65 S.Ct. 961, 969, 89 L.Ed. 1320] (1942); *FTC v. Morton Salt Co.*, 334 U.S. 37, 46 [68 S.Ct. 822, 828, 92 L.Ed. 1196] (1948) ("the statute does not require the Commission to find that injury has actually resulted"). Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to "any person who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws . . . ." To recover treble

---

**7.** The Court of Appeals for the Fifth Circuit had dismissed Payne's complaint, reversing a jury award in its favor. It found that in order to recover damages under § 4 of the Clayton Act, a plaintiff must prove (1) a violation of the antitrust laws, (2) recognizable injury attributable to the violation, and (3) at least the approximate amount of damages. It found it unnecessary to consider whether Payne had proved that Chrysler's incentive programs violated § 2(a) because, in its view, Payne had "failed to introduce substantial evidence of injury attributable to the program, much less substantial evidence of the amount of such injury." *Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133, 1134 (5th Cir. 1979).

damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent. *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648 [89 S.Ct. 1871, 1874, 23 L.Ed.2d 599] (1969) (plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the act and the injury suffered."). It must prove more than a violation of § 2(a), since such proof establishes only that injury *may* result.

Our decision here is virtually governed by our reasoning in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 [97 S.Ct. 690, 50 L.Ed.2d 701] (1977). There we rejected the contention that the mere violation of § 7 of the Clayton Act, which prohibits mergers which *may* substantially lessen competition, gives rise to a damage claim under § 4. We explained that "to recover damages [under § 4] respondents must prove more than that the petitioner violated § 7, since such proof established only that injury may result." *Id.*, at 486 [97 S.Ct., at 696]. Likewise in this case, proof of a violation does not mean that a disfavored purchaser has been actually "injured" within the meaning of § 4.

The legislative history buttresses this view.... (Emphasis in original.)

—— U.S. at ——, 101 S.Ct. at 1927. This case disposes of Allen Pen's first argument.

■ Allen Pen's second argument is that it has, in any event, provided sufficient evidence of actual injury to get to the jury. Our search of the record, however, reveals no evidence that specifically shows or even tends to show that any competitor drew either profits or sales away from Allen Pen. *See Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457, 458 (2d Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957).

And, the evidence of price differences, for the reasons previously mentioned, is not by itself sufficiently strong to warrant an inference of actual injury. In fact, none of the damage theories that Allen Pen proposed to the district court refer to the business activity of a competitor. Rather, Allen Pen relied upon an estimate by its president, Alvin Shulkin, of what he believed the "rate of increase of gross profits" would have been had Allen Pen received lower prices during 1971–1975. This estimate consists of an inference from the fact that Allen Pen's gross profits on Springfield merchandise sales increased by about one-third in 1969 and 1970, to the conclusion that without the discrimination Allen Pen's gross profits would have grown correspondingly between 1970 and 1975.[8] This estimate takes no account of changes in costs, in economic conditions, in likely demand, or any of the myriad other economic factors that affect profitability—let alone *growth* in profitability. Indeed, no firm can readily count on a continuous rate of *growth* of profitability; and, there is no basis for assuming a causal relationship between the price differences charged here and a change in that growth rate. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 488–89, 97 S.Ct. at 697–98.

The evidence of actual injury here is far weaker than that presented by the plaintiff in *Truett Payne*. In that case, Payne, the plaintiff, produced evidence showing that the dealership's sales dropped 4% in 1972, one of the years when the challenged incentive programs were in effect;[9] average profits on used cars dropped (allegedly due to overly generous used car trade-in allowances given to counter competitors' edge); and an expert's hypothetical analysis of "predicted effects" of Chrysler's incentive programs' discrimination against Payne in-

---

**8.** The estimate purported to show what Allen Pen's sales (and profits) would have been in the absence of discrimination. Allen Pen's estimate amounted to little more than an assertion that since its gross profit on Springfield products increased 30% to 36% in good years (1969 over 1970, just prior to alleged discrimination), that "growth rate" should be applied to the entire period of discrimination to determine the profits not realized—regardless of whether Allen Pen gained or lost major accounts during 1971–1975 (as it did), and regardless of changing costs (and therefore changing *net* profits).

**9.** But sales actually increased 1% over the total period of the programs.

dicated that resulting retail car prices in Payne's sales area were theoretically higher than they otherwise would have been had Payne not been discriminated against.[10]

Four members of the Court, noting that actual injury consists of a loss of sales or profits, would have declared outright that this evidence was insufficient to present to a jury. The five member majority characterized the evidence as "weak", and added that "it is a close question whether petitioner's evidence would be sufficient to support a jury award even under our relaxed damages rules."[11] They sent the case back to the lower court, however, for a determination of whether Chrysler violated § 2(a), for, if not, the "lenient" antitrust rules governing proof of injury would not apply.

If the evidence in *Truett Payne* is borderline under a "lenient" rule, the showing here is clearly inadequate. Unlike Truett Payne, appellant here produced no economic expert; it did not go out of business; it showed no absolute drop in sales; and the affected sales were but a tiny fraction of its total business. While these are not indispensable prerequisites, their absence is fatal when a Robinson-Patman Act plaintiff fails, as here, to provide any coherent theory making plausible a causal connection between any violation that it was likely to show and any significant actual injury.

Allen Pen places its primary reliance upon a third argument: It points out that Springfield destroyed relevant records. This destruction, it adds, prevented it from establishing injury. For this reason, the district court should have sent the injury issue to the jury—either as a penalty or simply to allow the jury to infer, as a matter of common sense, from the fact of record destruction that the destroyed records would have proved injury.

 We do not accept this argument. For one thing, if a presumption of actual injury is to be made as a *penalty* for deliberate destruction of evidence, it is not appropriate here. On the one hand, Allen Pen correctly points out that Springfield's answers to its interrogatories, prepared with the assistance of counsel in 1976, identified computer-generated lists (Springfield's monthly invoice registers, monthly distribution journals and monthly sales analyses) which indicated, *inter alia*, the prices Springfield charged Allen Pen's competitors and the quantities shipped. Thus, these lists provided an obvious starting point for Allen Pen in its efforts to prove injury. Moreover, in 1977, six months after Springfield answered the interrogatories, it destroyed the lists. While Springfield states that it did so following an Internal Revenue Service audit and in the course of moving the office that contained them, Springfield should have preserved these documents. Allen Pen's interrogatories had targeted them for possible production; and they were specifically identified in response to a request to identify records central to Allen Pen's claim. *Cf. Alliance to End Repression v. Rochford*, 75 F.R.D. 438 (N.D.Ill.1976) (sanctions imposed on party which destroyed documents after learning of forthcoming suit; claim that documents were inadvertently destroyed in accordance with policy of destruction after one-year holding period not supported by evidence).

On the other hand, Allen Pen is not blameless. It made no Rule 34 request to produce these documents until April 1980, three and one-half years after it learned of their existence and just before trial. Moreover, Allen Pen seeks far too draconian a sanction. It might have asked, prior to trial, for costs and fees needed to obtain the same information from third parties. Fed. R.Civ.P. 37. Having failed to seek lesser remedies, it cannot wait for trial and then seek close to a declaration of victory on the issue. In any event, Allen Pen has not shown that the document destruction was in bad faith or flowed from the consciousness of a weak case. There is no evidence that Springfield believed the lists would have damaged it in a lawsuit. Without some such evidence, ordinarily no adverse

---

10. *J. Truett Payne Co. v. Chrysler Motors Corp.*, —— U.S. at ——, 101 S.Ct. at 1928.

11. *Id.*

inference is drawn from Springfield's failure to preserve them. *See McCormick on Evidence*, § 273, at 660–61 (1972); 2 *Wigmore on Evidence* § 285, at 192 (Chadbourn rev. 1979); *Commercial Ins. Co. of Newark, N.J. v. Gonzalez*, 512 F.2d 1307, 1314–15 (1st Cir.), *cert. denied*, 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (1975).

A further reason why it is not appropriate to infer injury to appellant from destruction of the computer records is that *the destroyed records would not have shown injury*. At best, they were an efficient starting point from which appellant could have ventured to discover from third parties—competitors—whether they had drawn sales or profits from Allen Pen as a result of price discrimination. Springfield's computer records, themselves, could not have established Allen Pen's *competitors'* sales or profits. Destruction of the computer records may have made it more difficult to develop evidence of loss of sales or profits. But it did not prevent Allen Pen from seeking to develop such evidence from third parties. We see no common sense inference that anyone could draw from the destruction that would be sufficient to establish actual injury under the *Truett Payne* case.

### III.

Appellant argues that the district court also erred in dismissing its other three claims—concerning display racks, brokerage, and refusal to deal. We consider each in turn.

### A.

Allen Pen claimed that Springfield, in providing competitors with display racks, violated Robinson-Patman Act § 2(e), which makes it unlawful "to discriminate . . . by . . . furnishing . . . any services or facilities connected with the . . . offering [of a good] for [re]sale . . . not accorded to all purchasers on proportionally equal terms." [12] The only evidence that appears on this subject in nine volumes of transcript and exhibits consists of the following: (1) Allen Pen's president testified that he asked for display racks in late 1974–1975 and did not receive them. He added that they would have helped his sales considerably. (2) The secretary-treasurer of Capital Toy, a competitor of Allen Pen, testified that he had received some display racks during 1971–1975, and they had helped his sales (the amount of sales and the number of racks were unspecified). (3) While reading into the record a long set of interrogatory answers mostly concerning prices, Allen Pen's counsel included a portion of Springfield's answer to interrogatory number 44, in which Springfield listed six instances over a five-year period in which it made display racks available to some customers for which it paid "in part or in full". These included one firm (Zayre's) which Allen Pen's president testified was a competitor. The number of racks provided varied widely from firm to firm. Zayre's, for example, which bought far more merchandise than did Allen Pen, received $15,000 worth of racks, but Woolworth's, which bought far more Springfield merchandise than did Zayre's, received only $800 worth of racks.

If we assume that the purpose of Robinson-Patman Act § 2(e) is, like that of the rest of the Act, to prevent injury to the profits or sales of a small firm caused by discrimination, then, following the lead of the Supreme Court in *Truett Payne*, we find no evidence of actual injury here. The evidence connecting this alleged § 2(e) violation with any economic injury to Allen Pen is more sparse and considerably weaker than the evidence discussed in Part II in relation to Allen Pen's § 2(a) claim. A further difficulty lies in the fact that Allen Pen presented no coherent argument concerning the number of racks to which "proportionally equal" treatment would have entitled it. Nor did it present evidence from which a jury might have inferred the likely dollar value of proportionality, thereby inferring the existence of actual injury. The interrogatory itself indicates that the racks' recipients may have paid for some of them. The list of six instances presented

12. 15 U.S.C. § 13(e).

suggests that racks may have been given out only occasionally, that the number provided varied considerably from year to year, and that the number provided bore no obvious relation to sales volume. Indeed, the evidence suggests little more than an occasional effort by Springfield to use the racks to meet the competition of its competitors—which is what it claimed in its answer to the interrogatory. If so, the offer of racks to an Allen Pen competitor is unlikely to have hurt Allen Pen, for in its absence that competitor would have accepted some equivalent advantage from a Springfield competitor. *See FTC Guides for Advertising Allowances and Other Merchandising Payments and Services*, 16 C.F.R. § 240.16 (1980). The problem is that these issues are simply unexplored in the record. Allen Pen provided no evidence of any systematic effort to provide some customers, but not others, with promotional advantages. Unless evidence of any occasional advantage provided *any* competitor is sufficient to make out a *prima facie* case of a § 2(e) violation—and we have found no case suggesting that it is—Allen Pen did not show a substantive violation of § 2(e). We believe that § 2(e), like the rest of the Robinson-Patman Act, is aimed at significant harm to competition; and therefore the injury suffered from its violation must be something more than failure to obtain a sporadic advantage once made available to a single competitor. We therefore find that Allen Pen did not provide sufficient evidence of actual injury.

### B.

■ There is also insufficient proof of a violation of § 2(c) which makes it unlawful to accept "brokerage . . . except for services rendered".[13] Allen Pen claims that Springfield violated this statute by requiring it to buy through Duo Associates, when its competitors could buy directly from Springfield. To show, as Allen Pen did, however, no more than the existence of a price difference between two customers,

one of which purchases through a broker and one of which purchases directly, is not sufficient to show that the price difference is an allowance of discount in lieu of brokerage. *See Federal Trade Comm'n v. Broch & Co.*, 363 U.S. 166, 175–76, 177 n.19, 80 S.Ct. 1158, 1163–64, 1165, 4 L.Ed.2d 1124 (1960); *Robinson v. Stanley Home Products, Inc.*, 272 F.2d 601, 603–04 (1st Cir. 1959). Rather, appellant must show that the sales agent, here Duo Associates, was interposed as a device or sham to give the favored customer a competitive advantage through a lower price. Appellant made no such showing whatsoever. *See Lupia v. Stella Doro Biscuit Co.*, 586 F.2d 1163, 1169–70 (7th Cir. 1978); *Ideal Plumbing Co. v. Benco, Inc.*, 529 F.2d 972, 977–78 (8th Cir. 1976). In any event, even if Allen Pen had made such a showing, it still would have had to establish injury, for § 2(c) is designed to prevent violation of the basic § 2(a) price discrimination prohibition under different guise. *Thomasville Chair Co. v. FTC*, 306 F.2d 541, 545 (5th Cir. 1962). For the reasons set out in Part II, we find that appellant made no such showing.

### C.

■ Finally, Allen Pen claims that it was injured as a result of Springfield's refusal to deal during part of 1975. Though appellant does not clearly specify the theory upon which it rests, one could argue that this refusal to deal sprang from Springfield's efforts to maintain a system of price discrimination that violated the antitrust laws. Therefore, if Allen Pen was injured by the refusal to deal, it was arguably injured by something "forbidden in the antitrust laws",[14] namely, the maintenance of the discriminatory pricing system. In the absence of that system, Springfield may have had no reason to refuse to deal.

Allen Pen, however, apparently treating this issue as peripheral in the case, did not prove any significant injury. During the period at issue, Springfield's products never amounted to more than two percent of Al-

---

**13.** 15 U.S.C. § 13(c).

**14.** Section 4, 15 U.S.C. § 15.

len Pen's sales. Throughout, Allen Pen was able to obtain Springfield's products from another supplier. And, it did obtain these products from another supplier during part of the period involved. It produced no evidence of loss of profit or sales as a result. Whether a plaintiff is injured at all is uncertain when alternative goods of equal quality are available and the volume withheld is not so large as to disrupt supply. *See Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,* 459 F.2d 138, 148–49 (6th Cir. 1972). Even if injury is sometimes possible in such circumstances, Allen Pen produced no evidence of such injury here. We say this fully aware of the difficulty of proving such injury and the concomitant need to apply "lenient" standards of proof. *See* cases cited in *J. Truett Payne Co. v. Chrysler Motors Corp.,* —— U.S. at ——, 101 S.Ct. at 1930.[15]

For the above reasons, the decision of the district court is

*Affirmed.*

---

**15.** In light of this holding, we need not decide appellant's claim that failure of the district court to certify the action as a class action was improper, and we simply note that several challenges to evidentiary rulings made by appellant are immaterial since, even if erroneous, they are harmless. Finally, appellant contended that injunctive relief was improperly denied. But appellant adduced no evidence at trial concerning Springfield's pricing since 1975, and appellant, itself, recommenced dealing with Springfield in late 1975. Under these circumstances, and in light of the directed verdict on, *inter alia,* the issue of injury to appellant, the district court clearly felt that injunctive relief was not warranted. We see no basis for interfering with that exercise of discretion.