**Barbara JACKSON, Plaintiff, Appellant,**

v.

**HARVARD UNIVERSITY, et al., Defendants, Appellees.**

**No. 89–1931.**

United States Court of Appeals, First Circuit.

Heard Feb. 9, 1990.

Decided April 9, 1990.

Evan T. Lawson with whom Lawson & Weitzen, Boston, Mass., was on brief, for plaintiff, appellant.

Allan A. Ryan, Jr., with whom Daniel Steiner, Cambridge, Mass., George Marshall Moriarty, and Ropes and Gray, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

In 1983, Harvard University (Harvard or the University) declined to offer tenure at its Graduate School of Business Administration (the Business School) to plaintiff-appellant Barbara Jackson. Jackson sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17 (1982), charging gender-based discrimination. She named as defendants both the University and the dean of the Business School, John McArthur. After a bench trial, the United States District Court for the District of Massachusetts ruled against her. *Jackson v. Harvard Univ.*, 721 F.Supp. 1397 (D.Mass.1989). Having carefully considered plaintiff's arguments on appeal and digested the rather imposing record, we find no significant legal error and therefore affirm.

## I. BACKGROUND

The evidence is exhaustively and accurately detailed in the opinion below, *id.* at 1399–1401, 1415–28, and it would be pleonastic to rehearse it here. We offer instead a synopsis designed to do no more than give needed context to the legal principles involved.

Tenure decisions at the Business School are subject to an exacting protocol. A subcommittee comprised of four faculty members measures the aspirant against the prescribed standards and presents an advisory report to the tenured faculty as a whole. The full faculty conducts its own review of the candidate. Two votes are taken by signed ballot, some weeks apart. While these tallies are not binding *stricto senso*, the dean will generally not recommend tenure to Harvard's president and governing boards unless a candidate commands substantial majority support within the faculty. As a practical matter, a decision by the dean not to recommend tenure is final.

Appellant began teaching at the Business School in 1973 with the rank of assistant professor. In 1977, she was promoted to associate professor. She was considered for tenure twice. At her 1981 review, she requested that certain faculty members be excluded from the first-level subcommittee. Such requests are not uncommon and are, for the most part, routinely allowed. In this instance, Jackson's wishes were honored with one exception: Professor Stephen Bradley was retained on the subcommittee despite Jackson's claim that Bradley was biased against women.

The subcommittee, including Bradley, performed its assigned functions. In general, the subcommittee's evaluation was favorable. Three of the members believed that Jackson merited tenure and that her main work, a book, met the required scholastic standards. Bradley disagreed with his colleagues' assessment of the book but voted to recommend tenure notwithstanding. At the first meeting of the tenured faculty, a substantial majority of those present favored appellant's promotion. In the final balloting, however, that majority evaporated and the faculty split rather evenly.

The Business School temporized: Jackson's appointment was extended for three years and her tenure review held in abeyance. Appellant acquiesced in this arrangement. When she was reconsidered

for tenure in 1983, however, she received only a slim majority in the vote of the full faculty. Eventually, tenure was denied. This litigation followed in due season.

## II. STANDARD OF REVIEW

■ The standard of review is crucial to the appellate task in this fact-intensive environment. "When a district court sits without a jury, the court of appeals cannot undertake to decide factual issues afresh." *Reliance Steel Prod. Co. v. Nat'l Fire Ins. Co.*, 880 F.2d 575, 576 (1st Cir.1989). Rather, constrained by the Civil Rules,[1] we review factual findings only for clear error. *Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1019 (1st Cir.1988); *Irons v. FBI*, 811 F.2d 681, 684 (1st Cir.1987); *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 71 (1st Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984). Fidelity to Rule 52(a) means that deference must be paid to the findings below: "It is not enough that [an appellate court] might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the district court apparently deemed innocent." *United States v. Nat'l Assoc. of Real Estate Boards*, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950); *see also Keyes*, 853 F.2d at 1020. Put bluntly, "[a]ppellate review of complex, fact-dominated issues cannot be allowed to descend to the level of Monday-morning quarterbacking." *Anderson v. Beatrice Foods Co.*, 900 F.2d 388 at 392–393 (1st Cir. Mar. 26, 1990). At the bottom line, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

## III. THE MERITS

■ Visualizing the record through the prism of Rule 52(a) clarifies the result we must reach. We do not pause to restate the recognized burden-shifting framework characteristic of Title VII cases involving circumstantial proof of discrimination, *see, e.g., Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Keyes*, 853 F.2d at 1023, but assume the reader's familiarity with so commonplace a rule. The record leaves no doubt but that the first two steps in the *Burdine* pavane were accomplished: (1) appellant made out a prima facie case and (2) defendants articulated a reason (failure to demonstrate the required scholarship) which, if authentic, was nondiscriminatory and sufficient to ground the tenure denial. Plaintiff then ascended to the framework's next stage, endeavoring to show that defendants' professed reason was a pretext for discrimination.

Given this posture, the proper focus of appellate inquiry must be the district court's ultimate finding of discrimination *vel non. See Dance v. Ripley*, 776 F.2d 370, 373 (1st Cir.1985); *Johnson*, 731 F.2d at 70. And in that regard,

> reviewing courts should [not] treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern 'the basic allocation of burdens and order of proof' in deciding this ultimate question.

*United States Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093).

Stripped of legalistic jargon, appellant's principal contentions rest squarely on this ultimate question. Her core claim reduces to the assertion that, had the facts been judged properly, she would have prevailed.

---

1. The Civil Rules provide in pertinent part:

   In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

   Fed.R.Civ.P. 52(a).

In the Rule 52 milieu, this is a high hurdle to vault, especially since articulation of defendants' reasons dissipated the evidentiary force of the original presumption. *See Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094; *Keyes*, 853 F.2d at 1023. The task of showing clear error is daunting—more so, perhaps, in a case like this, since courts must be mindful of the essentially subjective nature of tenure decisions and, therefore, "must take special care to preserve the University's autonomy in making lawful tenure decisions." *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 346 (1st Cir. 1989).

Appellant attempts to avoid the looming problem by claiming that the *Burdine* framework was inapplicable and that the burden of proof should have been allocated more favorably to her. But upon close perscrutation, this contention seems no more than an unfounded effort "to wriggle out from beneath Rule 52(a) by claiming that the district court mistook the law." *Reliance Steel*, 880 F.2d at 577.

■ If a plaintiff can provide direct evidence that gender bias infected the decisionmaking process, the *Burdine* framework becomes irrelevant and the burden shifts to defendant to prove that the same decision would have ensued in the absence of the alleged discrimination. *See Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) (plurality op.); *Fields v. Clark Univ.*, 817 F.2d 931, 935–37 (1st Cir.1987). Jackson says her case qualifies under this rubric by reason of two key evidentiary items: (1) McArthur told her that "if [the government or the public] wanted women on the [Business School] faculty in larger numbers, they would have to impose quotas because otherwise Harvard would go through the affirmative action procedures but would not actually promote women;" and (2) she was treated differently from male applicants in that Bradley was allowed to serve as a member of the 1981 subcommittee over Jackson's objection.

■ Plaintiff's glass is half full. The district court, to be sure, found it "likely" that McArthur "made some version of the [attributed] statement." 721 F.Supp. at 1433. The court also found that Jackson had suffered disparate treatment in respect to Bradley's inclusion on the screening panel. *Id.* at 1434. Nonetheless, the glass is also half empty: calling the evidence "direct" does not make it so, but merely camouflages the terrain. Seen in context, appellant has done no more than dress two factual disputes in rather ill-fitting "legal" costumery. She does not profit by such a masquerade. *See Reliance Steel*, 880 F.2d at 577. What appellant's analysis conveniently overlooks is that the inference sought to be drawn from her evidence—that gender bias skewed the decisionmaking process—is precisely a question of fact, and one which the district court resolved contrary to the interpretation urged by appellant. We explain briefly.

Direct evidence is evidence which, in and of itself, shows a discriminatory animus. Here, the district court, citing both McArthur's testimony that he held strong beliefs otherwise and the Business School's widely-admired affirmative action program, found Jackson's construction of McArthur's comment "strained." 721 F.Supp. at 1433. The court also found that "whatever caused Dean McArthur to reject [Jackson's] request to exclude Professor Bradley from [Jackson's] subcommittee, *it was not gender bias.*" *Id.* at 1434 (emphasis supplied). Moreover, Bradley's participation "played at most a *de minimis* role in the ultimate decision not to offer plaintiff tenure in 1981." *Id.* The court based its conclusions concerning the subcommittee's composition on a medley of considerations, including the absence of any persuasive evidence that Bradley was prejudiced against women; his vote to recommend tenure despite his personal reservations about appellant's scholarship; and the court's finding that the faculty's doubts anent scholarship, not Bradley's vote, caused the 1981 tenure denial. Plaintiff's "direct evidence" construct thus collapses of its own weight.

The remainder of Jackson's merits-related asseverations, howsoever ingeniously couched, implicate the weight of the evi-

dence, not its sufficiency or the legal infrastructure on which the decision rests. Her remonstrances are uniformly unavailing. The trial judge correctly understood and applied the substantive and procedural rules for probing sex discrimination in the context of academic tenure disputes. *See* 721 F.Supp. at 1401–04. The court's recension of the evidence and its selection of inferences, albeit not inevitable, has the ring of utter plausibility. While a different set of inferences could supportably have been drawn, it is not our province to second-guess the trial court's "election among conflicting facts or its choice of which competing inferences to draw...." *Irons v. FBI*, 811 F.2d at 684. Nor does counsel's eloquent presentation of Jackson's case carry the day: "the mere repetition of arguments, in strong language and with evident feeling, is insufficient to the task [of overbearing Rule 52(a)]." *Reliance Steel*, 880 F.2d at 577.

In this instance, a painstaking canvass of the record intimates no hint of clear error. Because we are not "left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we must leave the trial court's findings and conclusions undisturbed.[2]

## IV. DISCOVERY IRREGULARITIES

Appellant's next assignment of error implicates the district court's handling of certain discovery irregularities. There are two prominent bones of contention: (1) when appellant attempted to obtain access to the files of certain successful (male) tenure candidates, she found that they had been destroyed in contravention of the University's rules on document retention and storage; (2) although appellant sought production of the 1981 faculty vote tallies early on, defendants did not deliver them until the trial was nearly over, having initially represented that the records did not exist. Jackson argues that the trial court erred in finding defendants' conduct merely negligent and in imposing insufficiently exacting remedies.

We examine Jackson's complaints anent discovery in the ensemble. As to the appraisal of the University's cumulative conduct as negligent, 721 F.Supp. at 1404–05, we find adequate support for the district court's analysis. While the record is not unarguable as to defendants' intent and degree of culpability, ambiguity and alternative inference are for trial courts to sift. Since the finding of negligence is one of fact and falls within the range of plausibility, we cannot alter it. *See Anderson v. City of Bessemer City*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

Plaintiff's follow-on point is that, with Harvard's misconduct revealed, the district court should have acted more decisively under Fed.R.Civ.P. 26(g), 37(b), and 37(d) (collectively, empowering the court to levy sanctions for various kinds of discovery lapses). Jackson requested the judge to draw a negative inference about the content of the destroyed files and to preclude defendants from putting the faculty votes into evidence. The judge demurred, instead reopening the evidence and offering plaintiff a continuance, relaxation of an earlier privilege restriction, and the right to

**2.** Appellant complains that the district court erred by stating that "whether or not [Jackson] ... is more qualified than tenured males ... is irrelevant in this Title VII action." 721 F.Supp. at 1443. Although we question the court's choice of terminology, we disagree with appellant's characterization of the comment. Taken in context, the court's statement was an unmistakable reference to a settled principle: courts do not decide whether candidates' tenure qualifications were judged incorrectly, but only whether the ultimate decision was based on an unlawful factor. *See Sweeney v. Bd. of Trustees of Keene State College*, 604 F.2d 106, 112 (1st Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct.

733, 62 L.Ed.2d 731 (1980); *see also Keyes*, 853 F.2d at 1026 (even if plaintiff's qualifications were superior to those of successful male, that would not prove her case; an employer's mere "[e]rrors in judgment are not the stuff of Title VII transgressions"). Comparisons may, of course, have evidentiary value in Title VII litigation, *see, e.g., Brown v. Trustees of Boston Univ.*, 891 F.2d at 347–48 (discussing admissibility of docent-to-docent comparisons in tenure denial case), but other parts of the district court's opinion render it pellucid that the judge understood the real relevance of comparisons between Jackson's treatment and the treatment accorded male candidates. *See, e.g.*, 721 F.Supp. at 1438.

engage in further discovery. The court eschewed the imposition of more onerous sanctions, being "unwilling to decide this case on the basis of evidentiary constructs such as adverse inferences and preclusionary orders." *Id.* at 1405.

We review a choice of sanctions only for abuse of discretion. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976) (per curiam); *Anderson v. Beatrice Foods Co.,* 900 F.2d at 393; *Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1081 (1st Cir.1990). A district court's discretion to fashion discovery orders and remedies for misconduct is broad. *See In re San Juan Dupont Plaza Hotel Fire Litigation,* 859 F.2d 1007, 1019 (1st Cir.1988) (discovery orders); *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir. 1988) (discovery misconduct). The same breadth applies to a district court's decision to impose sanctions less severe than the outermost limits of discretion would allow, or, within the purview of Rule 37 at least, not to impose sanctions at all. *See Benitez–Allende v. Alcan Aluminio do Brasil, S.A.,* 857 F.2d 26, 33 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989); *Craig v. Far West Eng'g. Co.,* 265 F.2d 251, 260 (9th Cir.), *cert. denied,* 361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63 (1959); *cf. Unanue–Casal v. Unanue–Casal,* 898 F.2d 839, 841 (1st Cir. 1990) (Rule 11 sanctions "legally required" in some cases). Whether harsher sanctions were the best solution or whether we, if making a fresh diagnosis, might have prescribed some stronger medicine, are not determinative considerations. *See Marquis Theatre Corp. v. Condado Mini Cinema,* 846 F.2d 86, 90 (1st Cir.1988). Rather, appellate inquiry is limited to whether the trial court's chosen course of action came "safely within the universe of suitable" alternatives. *See Fashion House,* 892 F.2d at 1082.

In *Fashion House,* we observed that:
Abuse [of discretion] occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.

*Id.* at 1081 (quoting *Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988)). We find no abuse here. The considerations relied on by the district judge were relevant. Although Jackson disparages the court's findings and the manner in which they were weighted, she identifies nothing consequential which the court overlooked. By the same token, she points to nothing improper which the court examined. And the balance struck does not jar our sensibilities.

On this record, it was permissible for the court to conclude that the tardy production of records and the loss of evidence did not flow from defendants' consciousness that the documents would hurt their case. Once that finding was made, the court was entitled to treat it as an important part of the calculus of relief. *See Nation–Wide Check Corp, v. Forest Hills Distributors,* 692 F.2d 214, 219 (1st Cir.1982); *Allen Pen Co. v. Springfield Photo Mount Co.,* 653 F.2d 17, 23–24 (1st Cir.1981). After all, where misconduct is not willful or intentional, "there seems less reason for an adverse presumption." *Anderson v. Cryovac Inc.,* 862 F.2d at 926. Preclusion and negative inference are grave steps, "by no means an automatic response to a delayed disclosure ... [or] where failure to make discovery [is] not willful." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1341 (1st Cir.1988).

In this situation, we think it was reasonable for the judge to conclude that "the sanction needed to be one appropriate to the truth-finding process, not one that ... served only further to suppress evidence." 721 F.Supp. at 1414. The remedy devised—a continuance and an open run at further discovery—was a concinnous response to the problems created by the University's negligence. There is simply no principled way in which we can conclude that the trial court misused its broad discretion.

### V. CONCLUSION

To recapitulate, the district court's finding that the tenure denial was not a result of discriminatory animus on Harvard's part was not clearly wrong. Nor did the court overstep its broad discretionary powers in dealing with irregularities occurring in the course of pretrial discovery. Indeed, the record establishes, beyond serious question, that appellant received all the process that was due. Her most compelling complaint seems simply that, believing herself to be in the right, she nevertheless lost her case. Her dissatisfaction is understandable. But the University, on the evidence adduced at trial, had an equal claim to believe that it had struck no foul blows. Resolving which of the two disputants was entitled to prevail under applicable law in a close, fact-dominated case is precisely the sort of grist for which the trial mill was long ago devised.

*Affirmed.*