65 F.3d 160
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Linda L. JOLER, Plaintiff, Appellant,
v.
SCOTT PAPER COMPANY, Defendant, Appellee.
 No. 94-2196.
 United States Court of Appeals, First Circuit.
 Aug. 31, 1995.
 
 BOUDIN, Circuit Judge.
 
 
 1
 David G. Webbert with whom Law Offices of Phillip E. Johnson was on briefs for appellant.
 
 
 2
 William J. Kayatta, Jr. with whom B. Simeon Goldstein and Pierce, Atwood, Scribner, Allen, Smith & Lancaster were on brief for appellee.
 
 
 3
 Before SELYA and BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge,
 
 
 4
 Linda Joler, a supervisor at Scott Paper Company's paper mill in Winslow, Maine, was discharged In March 1992 as part of a "downsizing" that eliminated 35 percent of the salaried employees. Charging gender discrimination, Joler sued Scott in the district court, primarily under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et. seq. Joler also claimed under the Maine Human Right Act, 5 M.R.S.A. Secs. 4571-72, but the parties have not sought to distinguish the state claim from the federal claim.
 
 
 5
 After discovery, Scott moved for summary judgment. In a written decision the magistrate judge recommended that the motion be granted. On October 31, 1994, the district judge adopted the findings and recommendation of the magistrate judge without elaboration. Joler now appeals. Joler's most substantial claim on appeal is factual, namely, that she offered enough evidence of discrimination to justify a trial.
 
 
 6
 The framework for evaluating the evidence in a Title VII case depends on whether the charge is one of intentional discrimination or of disparate impact, Griggs v. Duke Power Co., 401 U.S. 424 (1971); in this case, only the former is alleged. Indeed, the layoff actually increased the percentage of female first line supervisors remaining. Joler's claim, therefore, depends on a showing that gender bias was the motive, or at least a motive, in selecting her for discharge. See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Woods v. Friction Materials, Inc, 30 F.3d 255, 260 (1st Cir.1994).
 
 
 7
 In Title VII cases, once the employee makes out a "prima facie " case, the employer must articulate a legitimate nondiscriminatory reason for the discharge. St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742, 2747-56 (1993); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-55 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). But neither burden is a heavy one and, for purposes of this appeal, Scott seemingly concedes that a prima facie case was made out and Joler concedes that Scott did articulate the required explanation.
 
 
 8
 While the burden to prove Scott's improper motive remained with Joler, she could avoid summary judgment simply by showing that substantial evidence supported her position. Fed.R.Civ.P. 56(c); Pagano v. Frank, 983 F.2d 343, 347 (1st Cir.1993). In evaluating the evidence tendered, we draw all reasonable inferences in favor of Joler as the party opposing summary judgment, and we review de novo the district court's decision to grant summary judgment. Id. The bare facts are these:
 
 
 9
 Joler began working at the mill in 1975, advanced several steps up the ladder, and in 1987 became the first female supervisor in the mill's Recycling Department. In fall 1991, Scott ordered the mill's management to cut the salaried work force by about 35 percent. The mill's management, who made the selection using guidelines from Scott's headquarters, comprised the mill manager, its human resources director, and the heads of each department. Every member of this team was a male.
 
 
 10
 The team divided all salaried employees into job groups made up of those who, regardless of their department, needed similar skills for their jobs; Joler, for example, was grouped among 27 operating floor leaders throughout the mill. Each employee was then graded numerically based on job skills, versatility and length of service. The employees in each job group were then ranked in order of the their scores and those with the lowest scores were selected for discharge.
 
 
 11
 Joler's score placed her as number 23 among the 27 operating floor leaders. Scott discharged the 10 lowest scoring operating floor leaders, comprising nine men and one woman (Joler). After the downsizing, 17 such leaders remained, of whom four were women, one having been promoted. Thus, the proportion of female leaders in the mill actually rose; but in the Recycling Department, the number of leaders changed from three men and one woman (Joler) to five men, two of the men being shifted from other departments.
 
 
 12
 Joler's case, as summarized on the appeal, amounts to this: Joler's record at the mill was a good one; the two new leaders added to the Recycling Department had poorer records than Joler's; Joler's ranking was adversely affected by an incident in which she complained about a subordinate who had made sexist comments about her; the mill had a history of too few women and of tolerating sexism; the rating scheme was biased against Joler and women in general; and the mill culpably destroyed documents and concealed its decision-making process.
 
 
 13
 If all of these claims were taken at face value, they could add up to a formidable case. But except for the first one--Joler was a good employee--the claims are overstated, incomplete or in two important instances largely unsupported. Whether what is left is enough remains to be considered. Still, it is of no use trying to weigh the wheat until the chaff has been separated out.
 
 
 14
 The two transferred leaders had flaws in their records, as did Joler; but each was ranked higher overall, and Joler presents no evidence that their rankings were deliberately overstated. It is quite true that there was some evidence that the transferees did not perform in the Recycling Department as well as had Joler. But Joler was experienced there, and they were not. The reorganization aimed, and permissibly so, to retain generalists who had the flexibility to be used in different jobs.
 
 
 15
 Joler's next claim is that she was fired in part because of her own recent complaint about sexual harassment by a male subordinate. This man (Marcel Moreau) made at least one sexist comment to Joler, Scott disciplined him, and then it softened the discipline greatly when his union complained. One or two members of the management group apparently thought that Joler's handling of the incident reflected badly on her skills in dealing with subordinates, but she herself admitted to problems in this sphere.
 
 
 16
 There is more substance to Joler's claim that women were underrepresented among the mill's employees and there were episodes of sexist comments by various of its male employees. But there is no evidence that these background facts, which are sadly quite common, had any effect on Joler's ratings or on the rating process. On the contrary, there is evidence that partly on account of this history, Scott made some efforts to assure that the downsizing did not decrease its female-to-male ratio.
 
 
 17
 We come, then, to the heart of the matter--the charge that Joler's own score and the rating process were biased against women. Joler's score was principally determined by her department head, Fletcher, and her brief says outright that he was motivated by gender bias stemming from the Moreau incident. On deposition, Joler herself said that apart from her discharge she never saw Fletcher discriminate against women, nor is there any objective evidence that he discriminated.
 
 
 18
 About the most that Joler's brief offers is his alleged statement to her, when he informed her of the discharge, that "you can cry now." If Fletcher made this statement (he denies it but we will assume arguendo that he made it), it likely reflects a stereotype. But Fletcher had supported Joler's promotion to leader over two competing males, and his ultimate appraisal of Joler was generally consistent with his appraisals before the Moreau incident. The charge of bias is simply without basis.
 
 
 19
 Having reviewed the evidence, we also reject Joler's claim that the "versatility" component of the job skills criteria revealed a bias against women. The resulting scores for men and women in this category can be viewed in different ways, some favorable to women and some to men. But despite claims to the contrary in Joler's brief, there is no evidence that the criterion or the scores were deliberately tilted and almost none that the criterion had a significant negative effect upon women as a group.
 
 
 20
 We turn finally to the charge of document destruction and concealment. Of course, a party's efforts to destroy or conceal evidence may give rise to an inference of consciousness of guilt, and this self-appraisal can be weighed with other evidence in the case. But businesses discard materials all the time. An inference of spoilation depends on underlying facts that would permit a fact-finder to conclude that those who destroyed the materials did so in "bad faith or ... consciousness of a weak case." Allen Pen Co. v. Springfield Photo Mount Co., 653 F.2d 17, 23 (1st Cir.1981). No such evidence is present here.
 
 
 21
 After the downsizing, the rating group kept the assessment sheets for every employee, handwritten comments on the sheets, and scores assigned to each employee by every rater. Perhaps unwisely, the group discarded separate handwritten notes made by individual managers during the discussion and a set of loose flip charts, one of which contained a more detailed breakdown of the scoring regime for versatility than was contained in the written assessment plan.
 
 
 22
 But what was retained by Scott makes it easy to reconstruct almost all of the rating process. There is no indication that anything was destroyed in order to prevent its use in litigation or that anything lost contained information helpful to Joler. On these facts, no rational basis exists for inferring that Scott engaged in spoilation. The magistrate judge did not err in rejecting the inference.
 
 
 23
 It is time to sum up. There is simply not enough evidence to underpin a charge that Joler was fired either solely or in part because of gender discrimination. Not only would the trial judge be compelled to direct a verdict if such a case were presented to a jury, but we have no reason to think that the gaps and weaknesses could be filled by anything likely to arise at trial. Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1121 (1st Cir.1995); see also 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2713.1 (2d ed.1983).
 
 
 24
 Joler criticizes the magistrate judge's analysis of the facts and the weight he assigned to certain pieces of evidence. There is no need to consider these criticisms separately. Because this court reviews the grant of summary judgment de novo, we have to make our own appraisal of the record. Even if we were to disagree with the magistrate judge on a particular point, our result would be the same and that is sufficient. Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir.1991).
 
 
 25
 Joler's remaining claims of "legal" error have no force. The "mixed motive" provision of the 1991 amendments to the statute, 42 U.S.C. Sec. 2000e-5(g)(2)(B), did in certain respects overrule the Supreme Court's decision in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), but in this case no improper mixed motive was shown by the evidence. Similarly, we agree with Joler that under Hicks, a plaintiff's prima facie case, coupled with evidence of pretext, can sometimes suffice to defeat summary judgment, see Woods v. Friction Materials, Inc., 30 F.3d 255, 260 (1st Cir.1994); but there is no evidence here sufficient to show Scott's asserted reason for the discharge was pretext.
 
 
 26
 This is a distressing case because of a hardship having nothing to do with discrimination. By all accounts, Joler was an able employee who served Scott with dedication for 16 years and did not, in any ordinary sense, deserve to lose her job. But it is in the nature of large scale reductions in force that qualified workers find themselves out of a job for economic reasons unrelated to personal fault. Title VII was not intended to remedy that problem.
 
 
 27
 Affirmed.