Satya N. MANDAVILLI,
et. al., Plaintiffs,

v.

NORMAN I. MALDONADO,
et. al., Defendants.

No. Civ. 97–1518(JP).

United States District Court,
D. Puerto Rico.

Feb. 22, 1999.

Wilma E. Reveron–Collazo, San Juan, P.R., Nora Vargas–Acosta, Rio Piedras, P.R., for plaintiffs.

Eric R. Ronda del Toro, Mercado & Soto, San Juan, P.R., Julio Nigaglioni Arrache, Cancio, Nadal, Rivera, Diaz & Berrios, San Juan, P.R., for defendants.

## *OPINION AND ORDER*

PIERAS, Senior District Judge.

## I. INTRODUCTION AND BACKGROUND

The Court has before it Defendants' Motion for Summary Judgment (**docket No. 60**), Motion Requesting Leave to Correct Summary Judgment (**docket No. 49**) and Plaintiff's Opposition to Motion for Summary Judgment (docket No. 64). Plaintiffs Satya N. Mandavilli ("Mandavilli"), Luis Gast Pineda ("Gast"), Laura Mastrangelo Puech ("Mastrangelo") and Carmen Castañeyra de Las Casas ("Castañeyra") are all former professors at the Mayaguez Campus of the University of Puerto Rico ("RUM"). Defendants include officials of RUM, the Chancellor, the Dean of the School of Engineering, the Chairperson of the Chemical of Engineering Department, members of the Engineering Personnel

Committee, the Dean of the School of Arts and Sciences, and members of RUM's Administrative Board. Plaintiffs allege that they have suffered discrimination at the hands of Defendants based on national origin, race, ethnic background, sex, and age in their denial of tenure.

This case involves claims for declaratory and injunctive relief as well as for monetary damages under 42 U.S.C. § 1981, § 1983, the Fifth and Fourteenth Amendments pursuant to 28 U.S.C. § 1343(3) and (4), Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. § 2000e ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, 29 U.S.C. § 215, 28 U.S.C. 1343(4), 28 U.S.C. § 1331(a), and supplemental state law claims under article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141.

A brief history of the proceedings in this case is in order. Plaintiffs filed their Complaint on April 8, 1997, and on September 2, 1997, the Court held an Initial Scheduling Conference (ISC). Because the parties were not prepared for the ISC, the Court scheduled a Further ISC for October 14, 1997. At the Further ISC, the Court set trial for March 16, 1998 and allowed until February 16, 1998 for the filling of any dispositive motions. On January 29, 1998, the parties filed a Joint Petition for Rescheduling of Proceedings, which the Court initially rejected. On February 24, 1998, however, at the Pretrial Conference and to the Court's chagrin, the parties were not prepared for trial. Thus, the Court decided to conduct a Further Status Conference, resetting trial for November 16, 1998. The Court inadvertently did not schedule a new dispositive motion deadline at the February 24, 1998 meeting, and therefore, on August 5, 1998, entered an Order setting the deadline for the filing of any dispositive motions as September 8, 1998. On October 8, 1998, the Court noted that the dispositive motion deadline had passed, and further informed the parties that the Clerk's Office's Notice to Counsel and the Public in response to Hurricane Georges did not apply to the instant case.

According to Defendants, the August 5, 1998 Order setting the dispositive motion deadline was mistakenly sent to Attorney Eric Ronda, who had not been working at Defendants' attorneys' firm since May 31, 1998. The Clerk's Office informed the Court that when Ronda had notified it of his new address and law firm, all filings in cases where he had appeared as an attorney were thereafter sent to his new law firm. Thus, in this case, Defendants' attorneys did not receive the Order indicating September 8, 1998 as the dispositive motion deadline from the Clerk's Office, and they found out about the Court's Order from Wilma Reverón, Plaintiffs' attorney. If Ronda had filed a motion withdrawing from the case when he left Defendants' attorneys' law firm, the Clerk's Office would have continued to send filings to the law firm representing Defendants instead of to Ronda at his new firm. If Attorney Ronda had initially forwarded the Court's Order to his old law firm, the parties would also not be in this predicament. If the Court had set a dispositive motion deadline when it rescheduled trial in February, all parties would have known of the September 8, 1998 deadline well in advance.

Therefore, the Court concluded that there was no clear party at fault for the late filing of Defendants' Summary Judgment Motion and on October 28, 1998, ordered Plaintiffs to respond to Defendants' Summary Judgment Motion by November 11, 1998. Instead of filing a response, Plaintiffs filed an Opposition to Motion Requesting Leave to File Motion for Summary Judgment on October 30, 1998, arguing that it would be unfair to permit Defendants to file a summary judgment motion at such a late date and in violation of the Court's Orders. On November 9, 1998, the parties met with the Court for a Pretrial Conference as well as to discuss the outstanding issues before

the Court, particularly the late filing of Defendants' Summary Judgment Motion. At this meeting, although Plaintiffs were not available by phone pursuant to the Court's ISC Order, the parties came to a settlement agreement, signed by Plaintiffs' and Defendants' attorneys, and thus, the Court refrained from ruling on the outstanding motions before it. On the eve of trial, however, Plaintiffs informed the Court that they had decided not to accept the settlement agreement, and on November 16, 1998 after further settlement discussions, the Court continued the trial *sine die*. On December 7, 1998, the Court denied Plaintiffs' Opposition to Motion Requesting Leave to File Motion for Summary Judgment and Ordered Plaintiffs to respond by December 30, 1998. Defendants never filed a reply to Plaintiffs' Opposition to Defendants Motion to Dismiss.

## II. UNCONTESTED FACTS

Based on the record and parties' contentions, the following facts are undisputed.

### A. Tenure and Promotion Evaluation Process at the University of Puerto Rico

At the time the events giving rise to Plaintiffs' Complaint occurred, the University of Puerto Rico ("UPR") was comprised of the Río Piedras, Medical Sciences and Mayaguez (RUM) campuses, the University Colleges of Humacao and Cayey, and the Administration of Regional Colleges. RUM is the second largest campus of the UPR system and is comprised of the Colleges of Arts & Sciences, Engineering, Agricultural Sciences, and Business Administration. These colleges are further sub-divided into departments and sections. The UPR is a public corporation which does not operate as a private enterprise and is funded mostly by the Puerto Rico Government.

The UPR is governed by rules and regulations regarding the process of evaluating professors for promotions in rank and tenure determinations. Various factors must be taken into consideration when determining promotions and tenure pursuant to Section 49.3 of the Regulations of the UPR. These factors include:

quality of teaching, research or disclosure; devotion to duties and college service; compliance with teaching duties; professional improvements; cooperation in the workings of the faculty, including committees; research and creation works performed; conferences on subjects related to its field of expertise; publications; expositions, concerts and other analogous; acknowledgments received; well grounded and supported opinions by its fellow workers and other persons related to its job; professional attitude; disposition of the professor to participate in professional activities; and its fairness, tact, good judgment, discretion, and objectivity in handling situations in which it takes part; spontaneous cooperation with the unit it serves and with the institution in general.

In their evaluation process for tenure or promotions, professors are subject to both peer and student evaluations. The peer evaluations are conducted by other tenured professors from the same department as the tenure or promotion candidate, and this body of professors is called the Department Personnel Committee. Student evaluations are distributed at the end of the academic semester and are ultimately compiled and made part of the professor's personnel file.

Once a professor is entitled to a promotion or tenure, the professor's Department Personnel Committee issues a recommendation as to whether the Committee supports the proposed action. Along with this assessment, the Department Personnel Committee delivers a copy of student evaluations and the candidate's personnel file to the Faculty Personnel Committee. The Faculty Personnel Committee is comprised of one elected representative from each Department Personnel Committee and one or two representatives appointed by the

Dean. Upon receiving the information from the Department Personnel Committee regarding a tenure/promotion candidate, the Faculty Committee decides either to accept or reject the Department Personnel Committee's recommendation or to render one of their own. Also at this time, the Dean and Chair of the Department may also make their own recommendations for or against a candidate.

The Faculty Committee's evaluation is then sent to the Administrative Board of RUM, together with the Department Personnel Committee's recommendation, student evaluations, other relevant documents, and the Chair or Dean's position statement. The Administrative Board is the entity which ultimately decides if a professor will be promoted or given tenure. The Administrative Board is comprised of the Deans of the Colleges of Engineering, Arts & Sciences, Agricultural Sciences, and Business Administration; the Deans of Students Affairs, Academic Affairs, and Administration; one representative elected by the students; two representatives elected by the faculty; and the Chancellor. The decisions of the Administrative Board are appealable to the University Board, and thereafter to the Board of Trustees of the UPR.

## B. Dr. Satya N. Mandavilli

Plaintiff Mandavilli was a professor at RUM in the Department of Chemical Engineering and is a national of India. Dr. Mandavilli was invited to RUM as a visiting professor and was hired under a service contract beginning on January 8, 1991. In 1992 Dr. Mandavilli was selected from among four candidates for a tenure track position in the area of Reaction Engineering and Bio Chemical Engineering. Dr. Mandavilli was eligible for tenure on December 31, 1995, and in accordance with the UPR General Rules and handbook for Faculty Personnel Evaluation, he requested an evaluation for a tenured position in January 1996. Dr. Mandavilli supplied

RUM officials with a report of his accomplishments since his arrival, and on November 15, 1995, he received a favorable recommendation for tenure from the Department Personnel Committee of the Chemical Engineering Department. The letter informing Dr. Mandavilli of the favorable departmental recommendation states that although he has not been able to obtain external funding for research projects, the Department Personnel Committee "trust[s] that he will eventually achieve that."

On December 6, 1995, Dr. José A. Colucci, Chair of the Chemical Engineering Department, sent a letter to Dr. Jack Allison, Faculty Dean, informing him of his opposition to the Chemical Engineering Personnel Committee's recommendation of Dr. Mandavilli. Dr. Colucci stated that he opposed the recommendation because Dr. Mandavilli's research performance did not fulfill the Department's expectations of developing an externally-funded program. On this same date, the Chemical Engineering Department Personnel Committee met again to consider Dr. Mandavilli's tenure application. At this meeting, Dr. Mandavilli's inability to obtain external research funds was discussed. In addition to the concern about external research funds, the Committee in general and specifically Professor Nellore Venkataraman, an Indian national, stated that Dr. Mandavilli's publications in Indian journals were not considered as rigorous as publications in U.S. journals. After this meeting and on December 6, 1995, the Department Personnel Committee issued a second letter, this time reconsidering its previous tenure recommendation of Dr. Mandavilli, based on his failure to develop a research program using external funds.

During his time at RUM, Dr. Mandavilli had submitted approximately 17 research proposals to external funding sources. Plaintiffs and Defendants, however, dispute whether Dr. Mandavilli actually received external funding. While Defendants claim that Dr. Mandavilli did not

obtain any external funding, Plaintiffs point to a grant from the National Science Foundation totaling $112,575. Part of the grant, $56,700.00, was awarded to a Biochemical Engineering Laboratory proposed by Dr. Mandavilli.

On December 7, 1995, the Faculty Committee ratified the revised recommendations of the Department Personnel Committee and extended Dr. Mandavilli's probationary appointment for one additional year because of his "unsatisfactory performance in research." The RUM Administrative Board met on January 25, 1996 to consider Dr. Mandavilli's tenure, and by a vote of 3 in favor, 3 against, and 3 abstaining, the Board denied him tenure. On February 29, 1996, Dr. Mandavilli received notice from the RUM Administration Board signed by Dr. Ramos Biaggi, informing him that the Administrative Board decided not to grant him tenure.

### C. Dr. Luis Gast Pineda

Dr. Gast is a Colombian national with a Ph.D. degree in Mechanical Engineering from Rutgers University. Dr. Gast was hired in August 1991 under a service contract as a Professor of Mechanical Engineering at RUM. On July 1, 1993, Dr. Gast received a probationary appointment as professor of Mechanical Engineering, and during 1994–1995 he received a promotion to Assistant Professor. Dr. Gast testified in his deposition that he was aware of the fact that continuation in the Mechanical Engineering Department depended on student evaluations, peer evaluations, as well as other criteria such as attendance at meetings and research.

In accordance with the UPR Rules and Regulations and the Procedures Handbook for the Evaluation of Faculty Personnel, Dr. Gast requested to be evaluated for a permanent faculty position beginning in July 1996. Dr. Gast was unanimously recommended by the Department Personnel Committee on November 1, 1995, and also recommended by Dr. Fernando Benítez,

Chair of the Mechanical Engineering Department, and by the Faculty of the Mechanical Engineering Personnel Committee. The RUM Administrative Board, however, voted not to extend tenure to Dr. Gast by a vote of 3 in favor, 0 against, and 6 abstentions, notifying Dr. Gast of its decision on February 29, 1996. The reason given by the Administrative Board for Dr. Gast's denial of tenure was that his student evaluations were below satisfactory levels. At that time, Dr. Gast had an average of 4.09 points out of 5 point scale for student evaluations. On February 29, 1996, Chancellor Stuart J. Ramos notified Dr. Gast of the Board's decision not to appoint him to a tenured position and that his separation from RUM would take place effective June 30, 1996.

Dr. Gast appealed the decision to deny him tenure through the UPR's administrative appeals procedure. The University Board Legal Advisor, Francisco Samalot, analyzed the deliberations of the RUM Adminstrative Board, stating that:

> An analysis of the record in the hands of the University Board secretary leads us to propose and recommend that an Official Examiner be appointed to hold evidentiary hearings and to resolve the controversy of facts presented in the appeal, to issue conclusions of law and issue a report with his/her recommendations. The truth is that, on reading the deliberations of the members of the MC Board of February 8, 1996, the data offered and the ratings reported do not agree with the data reported by the personnel, departmental and college Committees; or with those offered by the Director of the Department and Dean of the College. For example, Dr. Villarubia indicates that "I see an average professor in an area which is really important and he is measured by his ability to give classes. In the averages, he is below 3. He is not outstanding in the area of teaching or research." And yet, in the longitudinal table of analysis ... is where the average ratings for a

period of five years are gathered (1991 to 1996) from the students and the committees in the area of teaching and investigating which reflect an average for the five areas of 4.05 and 4.62 for teaching and 3.95 for research, in a scale of five (5).

According to Plaintiffs, and not disputed by Defendants, the University Board revoked the Administrative Board's decision, concluding that there was no rational basis for the denial of tenure. Dr. Gast, however, left RUM, although it is unclear to the Court and not stated by either of the parties, how Dr. Gast's separation from RUM occurred.

### D. Dr. Laura Mastrangelo Puech

Dr. Mastrangelo is a Doctor of Mathematics and a Uruguayan national who has been married to Vladimir Lebduschka since 1968. Dr. Mastrangelo completed her undergraduate studies at the University of the Republic of Uruguay in Montevideo, receiving a bachelor's degree in Humanities and Sciences with a concentration in Mathematics. Dr. Mastrangelo first left Uruguay in 1965 to live in Moscow where she took courses in engineering. She moved to Rome, Italy in 1967, and in 1971 returned to Uruguay where she continued her studies and worked at the State University. Dr. Mastrangelo then moved to Iowa in 1986 to complete her doctorate degree, which she finished in 1991.

Dr. Mastrangelo was hired by RUM in August 1991 and given a probationary appointment as Assistant Professor of the Mathematics Department of the College of Arts and Sciences. She requested tenure in July 1996. The Mathematics Department Personnel Committee favorably recommended Dr. Mastrangelo on October 31, 1995 for a tenured position, as did Darrel W. Hayek, the Chair of the Mathematics Department.

The Administrative Board met on May 24, 1996, but did not accept the Committee's endorsement of Dr. Mastrangelo, issuing a denial of tenure certification on June 6, 1996. The Board's asserted reason for the denial of tenure was that Dr. Mastrangelo had low student evaluations, 2.86 out of a four point scale. Plaintiffs claim that the student evaluation average was based on erroneous information.

Shortly after her denial of tenure, Dr. Mastrangelo was offered a similar position with the same terms and conditions as her previous position at the UPR's Regional College of Aguadilla, which she did not accept. In February 1996, Dr. Mastrangelo's husband, Vladimir Lebduschka, accepted a job offer in New Jersey, and she has been there ever since. In August 1996, Dr. Mastrangelo began teaching at Rutgers University.

### E. Professor Carmen Castañeyra de las Casas

Professor Carmen Castañeyra is Peruvian and obtained a bachelors degree in Engineering Sciences with a specialty in Industrial Engineering from the National Engineering University in Lima, Perú in 1983. Also in 1983, Ms. Castañeyra married José Angulo Cuzzi and moved to Puerto Rico. Ms. Castañeyra commenced her post-graduate studies at RUM in August 1984, with a concentration in Engineering and a specialty in Management Systems. Professor Castañeyra obtained a Master's degree in May 1990 and was hired as an Instructor of Engineering at RUM for the 1990 academic year. In spring 1993, Professor Castañeyra applied for a probationary appointment, and the Director of the Engineering Department referred her to the Engineering Department Personnel Committee. She was recommended for a tenure-track position by the Personnel Committee, conditioned on her pursuit of a doctorate degree. Dr. Sharma, Chairman of the Engineering Department, endorsed the Personnel Committee's recommendation; however, the Faculty Personnel Committee denied her petition, indicating that she had to continue with her Ph.D. studies before receiving a tenure-track position. Professor Casta-

ñeyra's service contract was renewed and extended from July 1, 1994 through June 30, 1995.

In July 1994, Professor Castañeyra's petition for a tenure-track position was brought to the attention of the Engineering Department Personnel Committee for a second time. The Committee favorably recommended a probationary appointment for Professor Castañeyra on September 1, 1994, and on September 7, 1994, Professor Castañeyra's tenure-track petition was referred to Dean Allison for a final decision. The Faculty Personnel Committee favorably recommended a probationary appointment for Professor Castañeyra on February 15, 1995, and on March 7, 1995, the Dean sent the recommendation to Chancellor Ramos, who subsequently signed the recommendation.

On November 13, 1995, the Engineering Department Personnel Committee considered Professor Castañeyra for a promotion to Assistant Professor with tenure. The Committee recommended her for the position, but without tenure. The Dean endorsed the recommendation which was then referred to the Faculty Personnel Committee. The Faculty· Committee issued a negative recommendation and favored a one-year extension of her service contract, reiterating its recommendation that Professor Castañeyra pursue doctoral studies. The Administrative Board denied Professor Castañeyra an extension of her probationary appointment as well as tenure on January 26, 1996. The Board's stated reasons for the denial of tenure were Professor Castañeyra's lack of a doctorate degree as well as some negative student evaluations.

## III. DISCUSSION

### A. Defendants' Use of Summary Evidence

Before the Court addresses the merits of Defendants' summary judgment motion,

it must first resolve the issue of Defendants' use of evidence in summary/table form regarding the tenure and promotion rates at the UPR. This issue was first brought to the Court's attention on October 16, 1998. On this date and in anticipation of trial scheduled for November 16, 1998, Defendants requested leave to announce additional witnesses. These witnesses included UPR personnel who would explain several tables that summarize the decisions of the Administrative Board of the UPR regarding promotions and tenure of the faculty personnel for the academic years of 1992–93 through 1997–98. Defendants also include these tables in their Motion for Summary Judgment.

Plaintiffs initially opposed Defendants' request to announce additional witnesses, and they renewed their opposition to the inclusion of the tables as evidence on summary judgment in Plaintiffs' Opposition Motion. Plaintiffs argue that the tables should be excluded from consideration based on three grounds: (1) that the Court gave November 7, 1997 as the cut-off date for announcing additional witnesses;[1] (2) that Defendants violated Rule 1006 of the Federal Rules of Evidence by not allowing sufficient time to examine the underlying documents that form the basis of the tables; and (3) that evidence on promotion and tenure dates broken down by sex and national origin has little relevance, if any, in a case where the issue is disparate treatment rather than disparate impact.

The Court has not yet ruled on Defendant's request for leave to include additional witnesses as the trial in this case has been continued *sine die*. The Court, however, must address these arguments as they are part of Defendants' evidence on summary judgment. First, on February 26, 1998, the Court ordered Defendants to provide a historical record of their tenure denial rate and percentages of foreign na-

---

1. The Court notes that based on the change in trial date brought about by both parties and described in the Introduction and Back-

ground section, the November 17, 1997 date as a cut-off for the addition of witnesses would have been unrealistic.

tionals in their departments. Defendants complied with this order on April 1, 1998. Plaintiffs never directly addressed Defendants' arguments that they provided a preliminary table and documents on April 1, 1998. The evidence in the record, however, supports the inference that while Plaintiffs were clearly aware of the existence of a table summarizing tenure and promotion data, they did not receive all of the underlying documents supporting Defendant's final table until November 3, 1998.

Under Rule 1006 of the Federal Rules of Evidence:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. As is evident in the text of Rule 1006, the materials underlying a summary of voluminous evidence must be available at a reasonable time, and "[i]mplicit in this requirement is the opposing party's right to adequate time for the examination of the underlying documents in order to prepare a defense of challenge the accuracy of the summary." JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE MANUAL § 9.05[1] (1998).

If the instant case had gone to trial on November 16, 1998 as originally scheduled, the Court would have necessarily excluded the summary tables because Plaintiffs had not received the underlying documents until November 3, 1998, just 13 days before trial. The situation on summary judgment, however, is different. Plaintiffs had until December 30, 1998 to submit their response to Defendants' Summary Judgment Motion, and thus, had ample time—almost two months—to examine the documents underlying Defendants' tables. Therefore, the Court finds Plaintiffs' argument regarding the lack of sufficient time

to examine the documents, at this stage, to be without merit.

Plaintiffs' argument that the tables have little, if any, relevance in a disparate treatment case such as the case at bar is also without merit. The First Circuit has consistently held that statistics are relevant in disparate treatment cases even though they carry less probative value than statistics in a disparate impact case. *See McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals*, 140 F.3d 288, 304 (1st Cir.1998); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir.1993); *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 156 (1st Cir. 1990); *Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 113 n. 11 (1st Cir.1979). The only caveat to the use of statistics is when they are "so incomplete as to be inadmissible as irrelevant." *McMillan*, 140 F.3d at 303 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n. 10, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)). Plaintiffs in disparate treatment cases often use statistics to show that an employer's hiring or promotion pattern "conformed to a general pattern of discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see also, *McMillan*, 140 F.3d at 303; *Sweeney*, 604 F.2d at 113 n. 11. Although in this case it is Defendants who are attempting to introduce statistics to show the lack of a pattern of discrimination, the Court finds that this information can be relevant in assessing evidence of discrimination.

Plaintiffs point out, however, that based on a cursory examination of the documents underlying Defendants' summary tables, they detected various errors. In Plaintiffs' Motion in Limine, cited and referred to in their Opposition Motion, Plaintiffs assert that in comparing the documents to the tables, they discovered that three people are listed as the wrong sex, one person is listed twice with two different national origin listings, Plaintiff Gast is listed as Peruvian and his denial of tenure is omitted,

and Plaintiff Castañeyra's denial of tenure is not listed. Plaintiffs assert that because the tables are inaccurate, the Court is compelled to bar them from consideration both on summary judgment and at trial.

In order for summary evidence to be admissible, it should "accurately reflect the underlying documents." 6 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 1006.07[1] (Joseph M. McLaughlin ed., 2d ed.1998); *Needham v. White Labs., Inc.,* 639 F.2d 394, 403 (7th Cir.1981). Summary evidence can be excluded if the proponent of such evidence fails to carry its burden to prove accuracy. *See id.* A Court, however, may admit an allegedly inaccurate summary to a jury if accompanied by an appropriate limiting instruction. *See id.; United States v. Nivica,* 887 F.2d 1110, 1125 (1st Cir.1989). At this stage in the instant case, the Court need not make a determination as to the admissibility of the summary evidence at trial. Defendants have not yet had the opportunity to oppose Plaintiffs' Motion in Limine as the Court has not set a date for their Opposition Motion. Since Plaintiffs contest the facts relied upon in Defendants' summaries, however, the Court cannot consider this evidence on summary judgment. Thus, although the Court will not consider the evidence in deciding Defendants' Motion for Summary Judgment, it will reserve its ruling on the tables' admissibility at trial until Defendants have responded to Plaintiffs' Motion in Limine.

### B. Summary Judgment Standard in the Context of ADEA and Title VII Cases

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if, based on the substantive law at issue, it might affect the outcome of the

case. *Id.* at 248, 106 S.Ct. 2505; *Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989).

The party opposing summary judgment may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See Goldman v. First National Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *First Nat. Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). To survive a motion for summary judgment in the context of an ADEA or Title VII case, "a plaintiff must establish at least a genuine issue of material fact on every element essential to his case in chief." *Vega,* 3 F.3d at 479 (quoting *Mesnick v. General Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991)). Thus, a plaintiff must adduce "some minimally sufficient evidence to support a jury finding that he has met his burden." *Id.* Ultimately, the non-movant must provide specific facts supporting her claim that the real reason behind the employer's decision was discrimination or driven by "discriminatory animus." *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993); *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 9 (1st Cir.1990).

### C. Direct Evidence of Age Discrimination

Defendants argue on summary judgment that Dr. Mandavilli's age and national origin discrimination claims are without merit and that summary judgment should be granted in their favor. Defendants assert that Dr. Mandavilli was unable to articulate sufficient evidence of differential treatment based on age or national origin to fulfill his burden and to survive sum-

mary judgment. Plaintiffs, however, claim that they have direct evidence of age discrimination as well as direct and/or circumstantial evidence of national origin discrimination.

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). Congress' purpose in promulgating the ADEA was to protect older workers from being "deprived of employment opportunities due to inaccurate stereotypes." *Bramble v. American Postal Workers Union, AFL—CIO, Providence Local,* 135 F.3d 21, 24 (1st Cir.1998) (citing *EEOC v. Wyoming,* 460 U.S. 226, 231, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)).

■ The central issue in an ADEA claim is "whether or not plaintiff was discharged 'because of his age,'" or that "plaintiff's age was the 'determining factor' in his discharge in the sense that, 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged." *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104, 1110 (1st Cir.1989) (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017, 1019 (1st Cir.1979)). Courts have recognized two distinct frameworks for assessing evidence of age discrimination, based on whether the evidence proffered by plaintiff is direct or circumstantial in nature. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ At all times, however, and regardless of the type of evidence presented, an ADEA plaintiff bears the ultimate burden of proving that the adverse employment action was taken on account of age. *See Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 12 (1st Cir.1998) (citing *Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 332 (1st Cir.1997)); *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 723 (1st

Cir.1994). Thus, on summary judgment, Defendants will prevail only if Dr. Mandavilli failed to "adduce sufficient evidence from which a rational fact finder could return a verdict in his favor," *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *American Airlines, Inc. v. Cardoza–Rodriguez,* 133 F.3d 111, 116 (1st Cir.1998)), "without resorting to 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Id.* (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)).

In Dr. Mandavilli's case, he claims to have proffered direct evidence of age discrimination. This evidence includes statements made by members of the Administrative Board during the deliberations held on January 26, 1996 regarding his tenure appointment. The relevant portions of the transcript are as follows:

[discussion about Dr. Mandavilli's research efforts]

Dr. Ramos: From the letter of Dr. Mandavilli dated December 8, 1995 through the dean to Dr. Allison, where does he come from?

Dr. Allison: From India.

Dr. Ramos: He obtained his doctorate in '59. He has 37 years of new experience in research.

Dr. Allison: Let's go to one of the parts that is in controversy that has to do with the students. In five years he has had one graduate student. In that department the students decide who is going to be their adviser, since he doesn't have funds then he has no graduate students. He says that he feels he has met one of the requirements, he feels he has done it, Colucci feels he has not done it. Now in September there came a grant in which he participated; he wrote a paragraph on how to use the money for laboratory equipment. This professor like many professors [who] are hired to do different things, one of the things has to do with the teaching part. There were certain expectations regarding this

person which he has not met. To give an additional year is to give him the benefit of the doubt. He has good evaluations from the students, nevertheless his very peers think that it is due to other reasons.

Dr. Villarrubia: There are some questions that concern me seriously, that one department does certain things and then seeks to have others correct them for it. *The department made a mistake by bringing in a person of such advanced age to teach classes one after another and then seek to entrust him with certain tasks.* You cannot establish a pattern as to the proposals he presents. They are of every sort. He really tries to make an effort, all his classes are graduate level, at this level it is completely different, with students with more maturity. *I am concerned about the fact of his age. If he is coming from India he will have social security. The reality is that the university is trying to renew itself.*

Mr. Luis Pérez: The professor has given graduate courses, but he has undergraduate.

Dr. Allison: In the Chemical Engineering Dept. He has required classes that are level 4000.

Dr. Ramos: The reality is that you cannot let yourself go by the number.

Mr. Luis Pérez: *If he were given tenure he is not going to be here for another 25 years. We are an Institution which is said not to discriminate, we cannot demand of certain people more that we do from others when they are going to be given tenure, you have to evaluate him as with everybody else to give him tenure, the fact that he is older is no reason to deny him that.*

Dr. Allison: I differ with Dr. Villarrubia. Here there was a person who had a good file and certain expectations were generated. The fact that I think that we cannot nor should we these days think that we are an institution oriented to-ward certain areas, those days are over. We have to be evolving and developing certain areas. We have to be clear that we have to leave the units certain independence of judgment with those who are in positions of advanced development to be a first class university where we can have certain degrees of the first order. There is a department which has imposed on itself as a goal and has spent years working trying to develop the area of graduate study research and every time the the the [sic] higher entities reach this same crossroads and they grab away that initiative from that department. This is a department which has set for itself the goal to be, within five years, to be among the first Chemical Engineering programs in the United States. Here we have where there are certain expectation sand because a department has not reached that stage we have to evaluate this. What we are given by the Regulations are the criteria, what we are given by the Regulations are the steps.

[discussion of research proposals]

Dr. Ramos: Call for a vote. In favor 3. Against 3. Abstentions 3. It does not pass. We are losing a good professor. *I presented the matter of his age so that when you see him, he is already a person who has made his career. The grants are not as pure as people think. He made his career in India and the United States where he is not known. There are some fields that are not as easy to get funds in. When I talked about his age, I didn't say it referring to discrimination being committed.* No one realized that the research was in India. It was easier for him because it was in India. What I mean is that we are going to lose a good professor. The department wants to give him research, if they had just left him alone to teach classes . . .

(emphasis added).

■ Direct evidence of discrimination is defined as evidence "which, in and of itself, shows a discriminatory animus."

*Jackson v. Harvard University,* 900 F.2d 464, 467 (1st Cir.1990); *c.f. Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, (1st Cir. 1996) (Bownes, J., concurring) ("this Circuit has yet to clearly define what constitutes direct evidence of ... discrimination," discussing *Jackson,* "this reasoning is circular and does not further the understanding of the term."). Other Circuits have similarly defined direct evidence of discrimination. *See Nichols v. Loral Vought Systems Corp.,* 81 F.3d 38 (5th Cir.1996) (quoting *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 956 (5th Cir.1993) (direct evidence of discrimination is evidence "which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions.")); *Troupe v. May Dept. Stores Co.,* 20 F.3d 734 (7th Cir.1994) (direct evidence of discrimination "can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents."). Direct evidence is not, however, "stray remarks in the workplace...., statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring); *see also Shorette,* 155 F.3d at 13; *Speen v. Crown Clothing Corp.,* 102 F.3d 625, 636 (1st Cir.1996).

The First Circuit recently addressed the issue of what constitutes direct evidence of discrimination in *Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8. In *Shorette,* the First Circuit rejected the plaintiff's contention that two comments constituted direct evidence of discrimination. The first statement was made by the plaintiff's district manager, consisting of the district manager asking the plaintiff how old he was and when he planned to retire. The First Circuit stated that this comment was "a textbook example of an isolated remark which demonstrates nothing," emphasizing that there was no evidence that the speaker/district manager had authority in determining the plaintiff's demotion. *Id.* at 13. The second comment at issue was made by the plaintiff's direct manager who said that

the plaintiff had "a perfect case of age discrimination, and [that he would] be crazy not to pursue it." *Id.* In deciding that this comment was not direct evidence of age discrimination, the First Circuit again pointed out that there was no evidence that the manager had participated in the decision to demote the plaintiff.

In the instant case, the speakers of the age-related comments were not only the decisionmakers who denied tenure for Dr. Mandavilli's, but these decisionmakers were in the process of specifically discussing whether or not to grant tenure to Dr. Mandavilli. The comments made by Dr. Villarrubia and Mr. Pérez were not stray or isolated remarks, but rather, were comments made in the context of deciding Dr. Mandavilli's tenure application. The Court finds that Dr. Villarrubia's comments, specifically that the department had "made a mistake by bringing in a person of such advanced age to teach classes one after another and then seek to entrust him with certain tasks," that he is "concerned about the fact of his age," and that "the university is trying to renew itself," are clear instances of direct evidence of age discrimination. Dr. Mandavilli has presented the rare "smoking gun" in a discrimination case that compels the Court to find that he has come forth with direct evidence of discrimination. The Court also notes that Dr. Ramos' attempt later in the discussion to temper the comments about Dr. Mandavilli's age does not change this Court's determination that Dr. Villarrubia's statements are direct evidence of age discrimination.

When a plaintiff has shown direct evidence of discrimination, a Court must examine the evidence under the standard set out by the United States Supreme Court in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), as modified by the 1991 Civil Rights Act, 42 U.S.C. §§ 2000e–2 (m), 2000e–5(g)(2)(B). Under the *Price Waterhouse* rubric, once direct evidence of discrimination is demonstrated, the Defendant must prove by a preponderance of

evidence that it would have made the same employment decision without considering the illegitimate factor, in this case, age. The 1991 Civil Rights Act, however, overruled *Price Waterhouse* in part, by prohibiting a Defendant from defeating liability altogether even if the defendant shows it would have made the same decision regardless of the illegal motive. Rather, a defendant can only limit the employee's remedy by such a showing. *See* 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B); *F.W. Morse & Co.*, 76 F.3d at 431 ("The Civil Rights Act of 1991 'modified the Price Waterhouse scheme' and made 'mixed-motives treatment more favorable to plaintiffs.' quoting *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir.1995). Section 107 of the Act provides that Title VII is violated whenever an employer takes sex or pregnancy into account, regardless of whether other considerations independently explain the averse employment decision.") (citations omitted); *O'Day v. McDonnell Douglas Helicopter*, 79 F.3d 756, 760 (9th Cir. 1996).

The Court finds that Dr. Mandavilli has at least demonstrated a disputed issue of material fact as to whether the illegitimate criterion of age "played a motivating part in [Defendants'] employment decision," under the *Price Waterhouse* rubric. *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775, as modified by the 1991 Civil Rights Act. Therefore, the Court cannot grant summary judgment for Defendants as to Dr. Mandavilli's claim of age discrimination and Defendants' motion is hereby DENIED.

### D. Circumstantial Evidence of Discrimination under Title VII of the Civil Rights Act and the ADEA

#### 1. Dr. Mandavilli's Claims of National Origin Discrimination[2]

■ Plaintiffs further assert that the comments made regarding Dr. Mandavilli's

Indian national origin are, like the comments about his age, direct evidence of national origin discrimination. The Court does not agree with Plaintiffs regarding these statements. As cited above, one of the statements regarding Dr. Mandavilli's national origin is made by Dr. Ramos who asked where Dr. Mandavilli came from, and Dr. Allison's reply that he is from India. The other comment was in the context of the age-related statement made by Dr. Villarrubia and concerning potential social security benefits for Dr. Mandavilli. Although these comments were made by decisionmakers during the discussion over whether to grant tenure to Dr. Mandavilli, they do not "in and of [themselves], show[ ] a discriminatory animus." *Jackson*, 900 F.2d at 467. Unlike the comments about Dr. Mandavilli's age, these remarks were not followed by statements that demonstrated, without any further inference, a discriminatory animus based on national origin. Thus, the Court cannot conclude that these statements about Dr. Mandavilli's national origin are direct evidence of discrimination.

■ If a plaintiff does not have direct evidence of discrimination in support of his claim, the "familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, comes into play." *Goldman v. First National Bank of Boston*, 985 F.2d 1113 (1st Cir.1993) (ADEA case) (citations omitted); *Pagano v. Frank*, 983 F.2d at 347–48 (Title VII national origin discrimination case). In the context of a denial of tenure, special considerations apply to the traditional *McDonnell Douglas* framework. *See Villanueva v. Wellesley College*, 930 F.2d 124, 128 (1st Cir.1991). A plaintiff must first establish by a preponderance of evidence that (1) he or she is a member of a protected class; (2) he or

---

**2.** Plaintiffs, in their Complaint, refer to "national origin, race or ethnic background," when describing their causes of action under Title VII, § 1981 and § 1983. (Compl.¶ 96)

For convenience, the Court uses the term "national origin" when referring to Plaintiffs' claims for national origin, race, or ethnic background discrimination.

she was a candidate for tenure and was qualified under the college or university's standards, practices or customs; (3) that despite these qualifications plaintiff was rejected; and, (4) that tenured positions in the relevant department remained open at the time he or she was denied tenure, in that others were granted tenure in the department during the same general time period. *See id.* (citing *Banerjee v. Board of Trustees of Smith College,* 648 F.2d 61, 62 (1st Cir.1981)).

Once a prima facie case is established, the burden shifts to the defendant to produce a valid non-discriminatory reason for the adverse employment action. *See Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir.1996); *Pagano,* 983 F.2d at 347–48. The defendant's burden under the *McDonnell Douglas* framework is only a burden of production; the burden of persuasion remains with the plaintiff. *See Sanchez Sepulveda v. Motorola Electronica De Puerto Rico, Inc.,* 988 F.Supp. 34, 37 (D.Puerto Rico 1997) (Pieras, J.). After a defendant has made such a showing, "the presumption raised by the prima facie case is rebutted and drops from the case." *Id.* (citing *Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 332 (1st Cir. 1997)). In the final stage, the burden of production returns to the plaintiff who must show that the defendant's stated reason for the adverse employment action was false and a pretext for the real motive, discrimination. *Mulero–Rodriguez,* 98 F.3d at 673; *Pagano,* 983 F.2d at 348.

The First Circuit has emphasized in tenure cases that Courts are not to function as "super-tenure" committees in assessing tenure cases. *Villanueva,* 930 F.2d at 129 (citing *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 345–46 (1st Cir.1989); *Kumar v. Board of Trustees, Univ. of Mass.,* 774 F.2d 1, 12 (1st Cir.1985) (Campbell, J., concurring); *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 174–75 (1st Cir.) *rev'd. on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)). "We are hesitant to intrude upon academic freedom, which, 'although not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment.' " *Id.* (citing *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). Courts, however, recognize the special role of federal courts in eradicating workplace discrimination, including educational institutions. *See Id.*

These concerns particular to educational institutions are especially important at the third stage of the *McDonnell Douglas* analysis as a plaintiff must convince a trier of fact that defendant's articulated reasons for denying tenure:

> were "obviously weak or implausible," or that the tenure standards for prevailing at the tenure decisions were "manifestly unequally applied." The essential words here are "obviously" and "manifestly." A court may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities; the evidence must be of such strength and quality as to permit a reasonable finding that the denial of tenure was "obviously" or "manifestly" unsupported.

*Id.* (quoting *Brown,* 891 F.2d at 346). In a tenure case, however, as in every other discrimination case, the plaintiff must ultimately show that a denial of tenure was motivated by illegal discrimination. *Id.* at 131.

Defendant argues that the only evidence Dr. Mandavilli presents of national origin discrimination, statements regarding the relative prestige of Indian journals, is not enough to show that the real reason for his denial of tenure was national origin discrimination. Plaintiffs, however, claim that the fact that Dr. Mandavilli did attain external research funds plus the statements made during the Administrative Board meeting and the articulated lack of respect for Indian journals is sufficient to defeat summary judgment as to his national origin discrimination claims.

■ Dr. Mandavilli satisfies his prima facie case under the *McDonnell Douglas/Villanueva* formula as he is of Indian national origin, was a candidate for tenure and qualified under UPR's regulations, was rejected despite these qualifications, and the tenured positions remained open. This is not disputed by Defendants. The burden then shifts to Defendants to show a valid, non-discriminatory reason for their denial of tenure. In this case, Defendants claim Dr. Mandavilli was not granted tenure because of his inability to obtain external research funds, and further, that his publications in Indian journals were not sufficiently prestigious. This reason is supported by substantial evidence in the record including: the advertisement for the position indicating that the tenure candidate was expected to secure external research funds; the letter from the Chemical Engineering Department Committee recommending tenure; Dr. Colucci's letter disagreeing with the recommendation of the Committee, and; discussions by the Administrative Board. Thus, although this reason is just one of many that the Administrative Board could have taken into consideration when assessing Dr. Mandavilli's tenure, *but see Villanueva,* 930 F.2d at 130 (candidate not sufficient in any of the five categories used to evaluate tenure potential), the Court finds that the proffered evidence is sufficient to show a legitimate, nondiscriminatory reason for the tenure decision.

Thus, Dr. Mandavilli must show that the tenure decision was " 'obviously' or 'manifestly' unsupported," and that the real reason behind the denial was discriminatory animus based on national origin. *Id.* at 129; *Mulero-Rodriguez,* 98 F.3d at 674–75. Plaintiffs point to evidence that Dr. Mandavilli submitted 17 proposals for external funding, and that he received external research funding in the form of a National Science Foundation (NSF) grant, of which $56,700.00 was awarded to a Biochemical Engineering Laboratory proposed by Dr. Mandavilli. Defendants do not specifically dispute this evidence, and thus, although it

is unclear to the Court what role Dr. Mandavilli played in receiving the NSF grant, the Court must construe the evidence in the light most favorable to Plaintiffs and assume this constitutes the receipt of external research funds. This fact, however, is not sufficient to show pretext and that the Administrative Board's determination is "obviously weak" or that the tenure decision was "manifestly unsupported." *Villanueva,* 930 F.2d at 129. The Court views Dr. Mandavilli's receipt of external research funds on one occasion as part of a larger grant as minor in comparison to the emphasis placed on external funding by the Chemical Engineering Department.

Even if this evidence were enough to show pretext, the Court finds that Plaintiffs have not fulfilled their burden to show that the real reason behind the tenure decision was national origin discrimination. Plaintiffs' primary contention that the basis of the Administrative Board's decision was national origin discrimination include the comments made at the Administrative Board meeting and dispute over the prestige of Indian journals. The Court concludes that this evidence is not sufficient to create a material issue of disputed fact regarding Dr. Mandavilli's denial of tenure based on his national origin discrimination.

The Court first notes that the inquiry into Dr. Mandavilli's national origin at the Administrative Board hearing and the comment made concerning his potential return to India do not create an inference of discrimination. Merely mentioning that Dr. Mandavilli is from India indicates nothing aside from the fact that the Board knew his country of origin. Further, the remark about social security similarly does not indicate a discriminatory intent.

Plaintiffs also contend that Defendants' reference to Dr. Venkataraman's negative views of Indian journals are an effort to attribute the allegedly discriminatory comments regarding Indian journals to an Indian national in order to avoid the appearance of discrimination. Plaintiffs point out

that Dr. Venkataraman is a Mechanical Engineer, not a Chemical Engineer, and that his opinion on the relative prestige of Indian journals was formed twenty years ago and is based on second-hand information he heard from colleagues. In addition, they point out that Dr. Colucci had a negative view of Indian journals independent of any statements by Dr. Venkataraman. Further, Plaintiffs assert that two journals, Indian Chemical Engineer and Institution of Engineer (India) are "referred" journals and have International Standard Serial numbers.

In his deposition testimony, Dr. Venkataraman comments that Dr. Mandavilli's publications in Indian journals were also co-authored by other professors from India, reflecting that Dr. Mandavilli was not developing projects at RUM. In addition, Dr. Venkataraman expressed a concern about Dr. Mandavilli's lack of publications in internationally famous journals, as he considered the Indian journals to be less prestigious.

Even assuming Plaintiffs' contentions regarding Indian journals are true, this does not create an inference of national origin discrimination as the reason behind Dr. Mandavilli's tenure denial. Dr. Venkataraman's opinion of the relative prestige of academic journals, even considered along with the statements made at the Administrative Board meeting, indicate no more than his opinion regarding the quality of academic publications. His views may imply that he and the Board would have looked more favorably on publications in what they perceived to be more prestigious journals, but they certainly do not indicate that Dr. Mandavilli's national origin was the real reason behind his tenure denial.

Therefore, the Court **GRANTS** Defendants' motion as to Dr. Mandavilli's claims of national origin discrimination under Title VII and **DISMISSES** Dr. Mandavilli's claim **WITH PREJUDICE.**

### 2. Dr. Luis Gast's Claims of Age and National Origin Discrimination

 Dr. Gast also claims that he was denied tenure at RUM because of his national origin and age. Defendants argue that Dr. Gast has not presented any evidence to show that his denial of tenure was based on age or national origin. Plaintiffs assert, however, that the University Board itself realized that Dr. Gast should have been given tenure, and that the Administrative Board held him to a different standard than other tenure candidates.

As Dr. Gast has not presented any direct evidence of either age or national origin discrimination, the Court must examine his claims under the modified *McDonnell Douglas* framework. Defendants have not disputed that Dr. Gast has met his prima facie case; therefore, the Court will move to the second stage of the burden-shifting framework.[3] Defendants' articulated reason at the Administrative Board meeting for Dr. Gast's denial of tenure is that he received low student evaluations. In addition, Defendants assert that Dr. Gast had not published in a referred journal, had not supervised any graduate students, had only participated in only one research project funded by the Puerto Rico Government, and had only participated in one professional presentation. Student evaluations are a legitimate criteria for denial of tenure, and the allegedly low evaluations were discussed by Luis Pérez, the student representative, and Dr. Halley Sánchez, former Dean of the College of Arts & Sciences, at the Administrative Board meeting. Therefore,

---

3. Although the Court will assume that Dr. Gast has met his prima facie case of age and national origin discrimination, Dr. Gast's age and the effect of the University Board's decision to reject the Administrative Board's denial of tenure are unclear from the record. Otherwise, however, he satisfies the *Villanueva* framework in that he is a Colombian national who was qualified for tenure and whose position remained open. *Villanueva,* 930 F.2d at 128 (1st Cir.1991).

the Court finds that Defendants' have satisfied their burden to demonstrate a legitimate reason for the denial of Dr. Gast's tenure.

In their attempt to show pretext for the Board's decision, Plaintiffs point out that during his time at RUM, Dr. Gast had taught various courses, actively participated in faculty related activities, and demonstrated initiative in his research and professional enrichment activities. Dr. Gast consistently received satisfactory performance evaluations-with an score during probation of 4.17 out of 5—from students and colleagues, and thus, according to Plaintiffs, should have been granted a tenured position.

Plaintiffs' main evidence that Defendants' stated reason is pretext is the findings of the University Attorney, Francisco Samalot, who investigated Dr. Gast's denial of tenure. Mr. Samalot recommended that an evidentiary hearing be held because the evidence in Dr. Gast's record did not support the decision to deny him tenure. Thus, by implication, and based on statements made in the Administrative Board deliberations, Plaintiffs contend that Dr. Gast was held to a higher standard for tenure than other candidates.

The Court finds that Plaintiffs' evidence is sufficient to show that the denial of tenure was "obviously" and "manifestly" unsupported by the record. The Court agrees with the University Attorney's findings that the Administrative Board's decision was not supported by Dr. Gast's record. Dr. Gast has failed, however, to show that the real reason behind his denial of tenure was national origin or age discrimination.

Plaintiffs infer from Mr. Samalot's conclusions and statements made during the Administrative Board meeting that Dr. Gast was held to a higher standard for tenure determinations than other candidates. While this inference is justified, and is sufficient to show pretext, there is no

further connection between the decision to deny tenure and discrimination. *See Villanueva*, 930 F.2d at 131. Plaintiffs make no comparisons between Dr. Gast and other younger and/or Puerto Rican candidates who were granted tenure in his department. Plaintiffs provide no evidence of remarks made by decisionmakers regarding Dr. Gast's age or national origin. In essence, Plaintiffs offer no evidence pointing to discrimination as the reason behind Dr. Gast's denial of tenure. The only evidence presented is that the Administrative Board's decision was unsupported by the record. While the Administrative Board may have held Dr. Gast to a higher standard than other candidates, this could have been for any number of permissible reasons. *See Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 871 (1st Cir.1997) (perception of different treatment not enough to show discrimination and withstand summary judgment in Title VII race and national origin claim, as inference of different treatment "was as likely due to a clash of personalities as anything else"). Without any evidence pointing to an inference of discrimination, the Court has no choice but to grant summary judgment for Defendants.

Therefore, as there is no genuine dispute as to whether Defendants' reason for denied tenure to Dr. Gast was a pretext for national origin or age discrimination, summary judgment is **GRANTED** for Defendants and Dr. Gast's claims for discrimination under Title VII and the ADEA are hereby **DISMISSED WITH PREJUDICE.**

### 3. Dr. Laura Mastrangelo's claims of national origin and sex discrimination

Defendants argue that the Court should grant summary judgment as to Dr. Mastrangelo's claims of sex and national origin discrimination because she cannot show that her denial of tenure was based on

discrimination.[4] Defendants point to Dr. Mastrangelo's deposition testimony in which, they claim, she was unable to articulate any particular instances of discrimination based on sex or national origin. Plaintiffs, however, provide evidence that Defendants' asserted reason for the denial of tenure was incorrect, and further, compare Dr. Mastrangelo to two male candidates in her department who received tenure.

Although Defendants do not contest the issue of Dr. Mastrangelo's prima facie case, the Court notes that she has satisfied her prima facie case under the *McDonnell Douglas/Villanueva* framework. Dr. Mastrangelo is a Uruguayan female who was qualified for tenure at RUM, she was rejected despite her qualifications, and her position remains open. Defendants have also satisfied their burden to show a legitimate non-discriminatory reason for Dr. Mastrangelo's denial of tenure. The Administrative Board's asserted reason was that Dr. Mastrangelo had low student evaluations.[5] As discussed in the context of Dr. Gast, the existence of low student evaluations in a professor's file is a legitimate reason for the denial of tenure.

Plaintiffs argue that Defendants' reasons are pretextual because the tenure denial was based on inaccurate information. Plaintiffs point to the testimony of Dr. Dorothy Bollman, Chair of the Department of Mathematics, who testifies that the two extremely low evaluations attributed to Dr. Mastrangelo are not, in fact, hers. Rather, Dr. Mastrangelo's student evaluation average is 3.49 which is "ex-tremely high," putting her "just about around the median." Thus, In addition, Plaintiffs point to the statement of Dr. Scott at the Administrative Board meeting, who was substituting for Dr. Sanchez, that RUM had received many complaints about Dr. Mastrangelo. Plaintiffs indicate that there is evidence in Dr. Mastrangelo's record that is contrary to Dr. Scott's statements, specifically the "Evaluation of Services of Staff Members" prepared by Dr. Hayek, stating that there were never any complaints about Dr. Mastrangelo. Further, the University's Legal Advisor, Francisco Samalot, recommended holding an evidentiary hearing regarding Dr. Mastrangelo's tenure denial because there was a question as to whether Dr. Mastrangelo actually received negative student evaluations, as well as due to the conflicting evidence before the Board regarding complaints against Mastrangelo and student evaluations.

In further support of their burden on summary judgment, Plaintiffs present evidence of two male professors who were granted tenure in Dr. Mastrangelo's department. According to Plaintiffs, Professor Herrera, who was granted tenure, does not have a Ph.D, and based on his record, students complained about him "on rare occasions." Plaintiffs note that Professor Herrera did not participate in any research, and further, students voiced concerns about his dependence on student presentations instead of lectures. In comparing her qualifications to those of Professor Herrera, Dr. Mastrangelo asserts

---

4. In their statement of uncontested facts, Defendants point out that Dr. Mastrangelo was offered a similar position at the UPR's Regional College of Aguadilla. This fact, however, was not developed as part of their argument, and therefore, the Court will not address the implications of this fact in its analysis of Defendants' basis for summary judgment.

5. Dr. Mastrangelo states in her Opposition Motion that Defendants offer no reason for the denial of tenure, citing to the a letter written to her by Dr. Ramos, including the

Board's Certification. The Court, however, notes that the University Legal Adviser states in his that "[i]n the instant case the basis or grounds for denying tenure for Prof. Laura Mastrangelo was the 'poor' student evaluations.' Even though the reasons are not stated in the Board's Certification, they can be deduced from the minutes of the meeting of May 24, 1996." (footnote omitted). The Court also determines from its own analysis of the Administrative Board minutes that their decision was based, in large part, on low student evaluations.

that not only does she have a Ph.D., but based on her Personnel Committee evaluation, she is a stronger candidate. Dr. Mastrangelo "never" was the subject of any student complaints, and was rated as "good" as to research. Dr. Mastrangelo also compares herself to another professor to attain tenure, Dr. Carlos Almada. Dr. Mastrangelo notes that while Dr. Almada had submitted only one paper for publication and had no actual or accepted publications while he was being evaluated for tenure, Dr. Mastrangelo had published two papers in scientific journals. Plaintiffs note, however, that in their evaluations, the two candidates received the same rank of "good" for research.

 When assessing evidence of pretext, the issue is not whether Defendants' asserted reasons are "real, but merely whether the decisionmakers.... believed them to be real." *Mulero–Rodriguez*, 98 F.3d at 674. Plaintiffs have presented evidence that the asserted reason for Dr. Mastrangelo's denial of tenure—low student evaluations—is false; however, they must also demonstrate that the decisionmakers themselves did not believe the asserted reasons. *See id.* Stated another way, Plaintiffs must provide evidence that undercuts Defendants' veracity regarding the asserted reason for denying tenure. The Court finds that Plaintiffs have made such a showing.

The transcript of the Administrative Board hearing, as pointed out by the University Legal Adviser, demonstrates that the Board's discussion about Dr. Mastrangelo's student evaluations and complaints made by students is inconclusive, at best.[6]

6. The transcript of the Administrative Board meeting regarding Dr. Mastrangelo's denial of tenure, in relevant part, reads as follows:

Dr. Ramos: She has an appeal for promotion before the University Board

Dr. I. Scott: Dr. Sanchez does not recommend that tenure.

Dr. Ramos: Later on we are going to see an appeal that she has, later on, is there any recommendation.

Mr. Crespo: I see the evaluations, it seems that she does not effectively reach the students.

Dr. Ramos: I believe that we should see the appeal and than see this. When we saw the promotion what we said was that we did not consider it. The University Board says that we have to see it in its merits. If we do not give tenure it is moot to see this.

Dr. Villarrubia: Motion to follow the order of the Board.

Dr. Ramos: There is a motion to follow the order of the agenda. Is there a recommendation.

Mr. Crespo: That tenure not be granted.

Dr. J.T. Allison: Would there be a possibility of making a summary of the student evaluations, I would like us to see if we can do this.

Prof. O. Ruiz: We are seeing a document which is unintelligible.

Dr. J. Fdez. Van Clave: Why does Dean Sanchez oppose the tenure of the professor.

Dr. I. Scott: I talked to him about the case, he told me that there were many complaints from the students, she does not reach the students.

Dr. J. Fdez. Van Clave: I continue with the concern of who is it that includes the student evaluations.

Dr. A. Velázquez: The letter of the acting director, it is the director who submits the evaluations.

Dr. Ramos: What is the situation. There is a motion that tenure not be granted. It is duly seconded.

Dr. J.T. Allison: She has a 3.37 in a scale of 4.00

Dr. J. Villarrubia: In 94 when her promotion was denied she was very effective.

Prof. A. Santos: The professor has to know how to stimulate the learning of the students.

Dr. J. Villarrubia: These are courses the students repeat "n" times"

Dr. Ramos: Any other comment.

Dr. Fdez. Van Cleve: There are recommendations of two committees which are favorable. They must have seen all this information here. If we "hit on" the committee, that is why we do not get people to work in the committees.

Dr. Ramos: That despite the existence of some bad evaluations, how do we reconcile some student evaluations that are bad and some good evaluations from the departments.

Dr. A. Velázquez: There is no congruence in the data.

[discussion of promotion vs. tenure]

Dr. A. Velázquez: We cannot make a decision with data as conflictive as this.

Dr. Ramos: The principal phase of a professor is to teach, to stimulate the student, that

In addition, Plaintiffs provide evidence that Dr. Sanchez, in his deposition testimony, admits that he never received any complaints regarding Dr. Mastrangelo's teaching. While it is not clear from this deposition testimony that Dr. Sanchez ever told Dr. Scott he heard of any complaints about Dr. Mastrangelo, the Court finds the testimony sufficient to call Dr. Scott's veracity at the Board meeting into question. If Dr. Sanchez never heard any complaints about Dr. Mastrangelo's teaching, he presumably never voiced this concern to Dr. Scott. Thus, the Court finds that a reasonable fact finder could conclude that Dr. Scott's statements to the Board regarding Dr. Mastrangelo were a pretext. This combined with the fact that Dr. Mastrangelo's record and staff evaluation were available to the Board during its decision further calls the Board's reasoning into question.

 The Court's inquiry, of course, does not end here. Dr. Mastrangelo must further demonstrate that she was passed over for tenure because of her sex and/or national origin. The essence of Plaintiffs' evidence of discrimination is that two male candidates, who Plaintiffs assert were as qualified or less qualified than Dr. Mastrangelo, were granted tenure. When using comparative evidence in a disparate treatment case, the evidence "must rest on proof that the proposed analogue is similarly situated in material respects." *Perkins v. Brigham & Women's Hospital,* 78 F.3d 747, 751 (1st Cir.1996) (citations omitted). While a plaintiff is not required to make an exact correlation, she "must demonstrate that the cases are 'fair congeners.'" *Id.* (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992)). In the tenure context, Plaintiff and the comparison candidates must have been up for tenure during a similar time-frame, as comparisons over a long period of time are "simply not probative." *Villanueva,* 930 F.2d at 131 (six to eight year difference in eligibility is too remote in time).

It appears from the documents proffered by Plaintiffs that Dr. Almada and Professor Herrera were granted tenure during the same time frame as Dr. Mastrangelo's tenure denial. In comparing the file of Dr. Mastrangelo to Professor Herrera, the Court finds further evidence of pretext as well as facts to support an inference of sex discrimination. The Court first notes that the task is not "to determine which of the candidates would have been [the] best choice for tenure," and further, that evidence that candidate was "as qualified as other candidates" is not sufficient. *Id.* The Court, however, believes that Plaintiffs have shown that the tenure criteria at RUM was "manifestly and unequally applied" in relation to Dr. Mastrangelo.

In comparing Dr. Mastrangelo to Professor Herrera, the Court is persuaded by the fact that Dr. Mastrangelo possess a Ph.D. while Professor Herrera does not, and further, that her Personnel Committee evaluation in research and, most notably, student evaluations/complaints, were higher than Professor Herrera. The fact that Professor Herrera received more student

he can comply with what he has to and it is that the students learn. We are giving or denying her tenure as a professor. The union of professor and student for me is very important.

Dr. Villarrubia: It is not the consistency of always, I am not sure that what happened was not the occurrence of one day, it is not a question that they are always negative, there are also positive on other occasions.

Dr. J. Fdez. Van Cleve: The student evaluations, the ones I can understand, there are good student evaluations. There are comments here from students that say that they do not like the change of professors in the courses. All of these comments contaminate the decision.

Dr. A. Velázquez: Of the allegations that point to something occurring with the professor, is the time that we have been analyzing the case and we have not been able to make a decision. We have some student evaluations. We ourselves are not sure in this case, wherefore we resist making a decision in this case, otherwise we would have made a decision a long time ago. [tenure vote, tenure not granted]

complaints than Dr. Mastrangelo is particularly significant, considering the reason given for her denial of tenure. The comparison to Dr. Almada is less clear, however, as the two candidates seem similar except in the research/publication area.

■ The Court finds Plaintiffs' comparison between Dr. Mastrangelo and Professor Herrera compelling and sufficient to create a disputed issue of fact as to her sex discrimination claim. Professor Herrera, a male tenure candidate, is objectively less qualified than Dr. Mastrangelo, and specifically has a lower rating in the area of student complaints. Plaintiffs proffered sufficient facts to create a material dispute as to Dr. Mastrangelo's claims of sex discrimination. Plaintiffs, however, have neither claimed that Professor Herrera is Puerto Rican, nor have provided any evidence pointing to national origin discrimination as the reason for Dr. Mastrangelo's denial of tenure. Thus, the Court hereby **GRANTS** summary judgment for Defendants as to Professor Mastrangelo's claim of national origin but **DENIES** the motion regarding her claims of sex discrimination under Title VII.

### 4. Professor Carmen Castañeyra's Claims of Sex and National Origin Discrimination

Defendants assert that the Court should grant summary judgment because Professor Castañeyra cannot show she was subject to discrimination based on sex or national origin. According to Defendants, Professor Castañeyra's only evidence of discrimination includes stray remarks made by Professor Cruz, a member of the

Engineering Department who was not on any of the Committees related to her tenure determination. In addition, Defendants allege that the testimony of Professor Eduardo Añeses, a RUM Professor who was granted tenure in the Engineering Department, is not sufficient to show that Castañeyra should have been granted tenure.

Plaintiffs contend that the Administrative Board's reasons for not granting tenure to Professor Castañeyra, low student evaluations and the lack of a Ph.D., are a pretext for discrimination. Plaintiffs point out that Professor Castañeyra had an average student evaluation score of 4.31 out of five, and thus, based on University Regulations, she should have been granted tenure.[7] Second, Plaintiffs point out that Professor Eduardo Añeses and another male Puerto Rican professor who is not named by Plaintiff, were granted tenure even though they both lack Ph.D. degrees. In addition, Plaintiffs claim that after Professor Castañeyra's denial of tenure, other Puerto Rican professors with a master's degree were granted tenure.

■ Professor Castañeyra satisfies her prima facie case as she is a Peruvian female who was qualified for tenure at RUM, was rejected despite her qualifications, and her position remains open. Defendants' articulated reason for the denial of tenure is based on two grounds, student evaluations and a lack of Ph.D. degree. The minutes from the Administrative Board meeting in which Professor Castañeyra was denied tenure suggest that both reasons formed the basis for the denial of tenure.[8] Thus, the Court finds that Defen-

---

7. The Court notes that although Plaintiffs allege that University regulations require Professor Castañeyra to have been granted tenure based on her average student evaluation score, they provide no evidence of this regulation. The Court was also unable to locate any such regulation in the record.

8. After voting to deny the extension of Professor Castañeyra's probationary period, Dr. Ramos states, "[w]e have to notify this professor that on July 1st her job ends. To establish

clear in the record that the decision made is not because of the Ph.D. but because of the student evaluations." Dr. Ramos also stated earlier that the "Ph.D. is not an issue." Aside from these statements, however, the Court notes that the issue of Professor Castañeyra's lack of a Ph.D. was clearly an issue throughout her pursuit of tenure, and was also discussed extensively by the Administrative Board. The issue of low student evaluations

dants have articulated legitimate reasons for Professor Castañeyra's tenure.

Plaintiffs' evidence of pretext, as discussed above, includes their unsupported allegation that Professor Castañeyra's average student evaluation score was so high that she should have been granted tenure pursuant to University regulations. Further, Professor Castañeyra compares herself to male Puerto Rican candidates who received tenure without obtaining or being required to obtain a Ph.D. For the reasons set forth below, the Court finds that Plaintiff Castañeyra has not produced sufficient evidence of a genuine dispute to avoid summary judgment on her sex and national origin discrimination claims.

As discussed in the context of Professor Mastrangelo's claims of discrimination, when using comparative evidence, a plaintiff must show that she and the proposed analogue are "similarly situated in material respects." *Perkins*, 78 F.3d at 751. Plaintiffs have failed to make even a minimal showing that Professor Castañeyra and Professor Eduardo Añeses or the other "male Puerto Rican professors with a Master's Degree" are similarly situated.[9] Unlike the evidence presented in support of Dr. Mastrangelo's comparison, Professor Castañeyra has not provided any information regarding Professor Eduardo Añeses' qualifications aside from his deposition testimony. Professor Añeses' testi-

mony indicates that he has a specialization in Architecture, does not have a Ph.D., does not have an Architecture licence, worked on a housing development in Moca, was offered and did not request tenure, and that he believes Luis Mendez and "Vilma," who are both Puerto Rican, were granted tenure after Professor Castañeyra was terminated.

First, the Court finds that the record does not show Professor Castañeyra and Añeses are similarly situated. Professor Castañeyra has a specialization in Management Systems and teaches a class in computer programming. Professor Añeses, however, has a specialization in Architecture. While Plaintiffs need not make an "exact correlation" between Professors Castañeyra and Añeses, they must be "fair congeners." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992)). Plaintiffs have not even made this minimal showing. In addition, Plaintiffs have not provided comparative evidence, as in Dr. Mastrangelo's case, that was used by RUM in making their tenure determination, such as performance evaluations or student evaluation scores. The Court does not have sufficient evidence by which to objectively compare Professors Castañeyra and Añeses. Thus, the Court finds that the comparative evidence provided by Plaintiffs is insufficient to create an issue

was also discussed by the Board and referred to as an issue against the granting of tenure.

9. Plaintiffs cite to the deposition testimony of Dr. Anand Sharma for the proposition that two other male professors were granted tenure without Ph.D.s and without their degree status being questioned. The one page of deposition testimony offered by Plaintiffs, however, does not support this proposition. The only statement that even remotely refers to this fact is the following:

Q: Okay. That was in spite of the fact that the faculty had made a negative recommendation, or had the faculty at any time changed their recommendation?
A: No, I think—remember, the faculty had simply put the—because if you go back to the recommendation of the departmental

committee, even earlier letters—I think there was another letter, uhhh, maybe the Caleron, and then before that, uhhh, Harry Juras (phonetic). Uhhh, they had always said, they had always supported her being on the 'probatorio' status. But, you know, we wanted her to proceed to her Ph.D. studies.
Q: Uh-huh
A: The faculty committee had simply put the two in reverse. They said, okay, you show us that you are interested, or you want to go for Ph.D., and ten we will look into the "probatorio" status. AS a consequence of that, and as triggered by Jorge Cruz–Emeric's letter, uhhh, all three of them—
Q: Were put on the probationary—
A:; Yeah, even though the other two never requested it.

of material fact as to their qualifications, and thus, cannot aid in fulfilling Plaintiffs' burden on summary judgment.

For similar reasons, Plaintiffs statements that "male Puerto Rican candidates" with only a Master's degree received tenure after Professor Castañeyra's denial of tenure are not sufficient to create an issue of material fact. To survive summary judgment, a plaintiff must provide affirmative evidence and not rely on conclusory allegations to meet their burden. *See Medina–Munoz*, 896 F.2d at 8. Plaintiffs' conclusory and unsupported allegations about "male Puerto Rican candidates" show nothing, and do not assist Plaintiff in meeting her burden on summary judgment.

The Court concludes that the evidence presented by Plaintiffs to show that Defendants' reasons were pretextual and that Professor Castañeyra's denial of tenure was based on sex or national origin discrimination is insufficient to create a genuine factual dispute. As Plaintiffs have not provided the Court with any other evidence in support of their burden on summary judgment, the Court hereby **GRANTS** summary judgment as to Plaintiff Castañeyra's claims of gender and national origin discrimination under Title VII.

### E. Court's Discretion to Grant Summary Judgment Sua Sponte as to Plaintiffs' § 1981 and § 1983 Claims

A district court has the power to grant summary judgment sua sponte, but the power "should be exercised sparingly." *Jardines Bacata, Ltd. v. Diaz–Marquez*, 878 F.2d 1555, 1561 (1st Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *National Expositions, Inc. v. Crowley Maritime Corp.*, 824 F.2d 131, 133–34 (1st Cir.1987)). Before a court can grant sua sponte summary judgment, "discovery in the case must be sufficiently advanced and the party against whom judgment was ordered must have been on notice to bring forth all of its evidence on the essential elements of the critical claim or defense." *Id.* The notice element requires the Court to assure that the losing party had reason to believe the Court might reach the issue disposed of, and also that the party had a fair opportunity to present evidence on its behalf. *See id.* "Properly deployed, that power [to grant sua sponte summary judgment] can complement the courts' case management authority" by disposing of non-trial worthy issues. *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir.1996).

Defendants in this case moved for summary judgment on Plaintiffs' claims for discrimination under Title VII and the ADEA. They further argued that the Court should not retain jurisdiction over Plaintiffs' supplemental Puerto Rico Law claims. Plaintiffs, however, also brought claims pursuant to 42 U.S.C. § 1981 and § 1983 for national origin, race, or ethnic background discrimination which Defendants did not specifically address in their Motion. Nevertheless, for the reasons set forth below, the Court grants summary judgment sua sponte as to Plaintiffs claims under §§ 1981 and 1983.

As stated by the First Circuit, "[i]n order to prove an individual claim of discriminatory treatment, whether under the Constitution or under Title VII, a plaintiff must prove purposeful discrimination." *White v. Vathally*, 732 F.2d 1037, 1039 (1st Cir.1984). Thus, discrimination claims under §§ 1981 and 1983 are analyzed under the same framework as Title VII cases. *See Id.* at 1039–40 (§ 1983 claim); *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996) (§ 1981 claim). Therefore, claims that have been dismissed pursuant to the Court's analysis under Title VII can also be dismissed, without additional analysis, under § 1981 and § 1983.

The Court finds that it has the power to grant sua sponte summary judgment as to Plaintiffs' §§ 1981 and 1983 claims. Not

only has discovery been sufficiently advanced in the instant case, but Plaintiffs fully briefed the issue of national origin discrimination under Title VII. Therefore, they necessarily had the opportunity to "bring forth all of [their] evidence on the essential elements" of their §§ 1981 and 1983 claims since the Court applies the same analysis to Title VII and §§ 1981 and 1983 claims. *Jardines Bacata, Ltd.*, 878 F.2d at 1561. Therefore, the Court finds that it is proper to **GRANT** summary judgment, sua sponte, as to all Plaintiffs' claims under §§ 1981 and 1983.

### F. Plaintiffs' Supplemental Claims under Puerto Rico Law

In addition to their federal claims, Plaintiffs bring claims under Puerto Rico Law for wrongful discharge, pursuant to "Law 80" of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a–185k and also tort law claims under article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141 (1990). Defendants state, without citing any evidence or supporting case law, that UPR is immune against damage suits under Puerto Rico law, and further, that Defendants are not an "employer" under Law 80. Further, Defendants ask the Court to dismiss Plaintiffs' supplemental Puerto Rico law claims if their federal claims are dismissed. Plaintiffs did not respond to these arguments.

■ First, the Court addresses Defendant UPR's claim of Eleventh Amendment immunity. The Eleventh Amendment protects a state defendant from suit in federal court. The University of Puerto Rico has been found to be an "arm of the state within the purview of the Eleventh Amendment." *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 18 (1st Cir.1990). Thus, unless there is an explicit waiver of sovereign immunity, UPR is immune from suit. *See Silva v. Universidad de Puerto Rico*, 817 F.Supp. 1000 (D.Puerto Rico 1993). The Court finds that neither Law 80 nor Article 1802 of the Puerto Rico Civil Code contain a waiver of sovereign immu-

nity. *See id.*; P.R. Laws Ann. tit. 26 § 2004. Therefore, Plaintiffs cannot sustain an action under Puerto Rico law against UPR, and therefore, all of Plaintiffs' claims under Puerto Rico Law are hereby **DISMISSED** as to UPR.

■ Defendants next argue that the individual Defendants are not "employers" under Law 80. Defendants do not cite to any definition of employer under Puerto Rico Law 80, nor do they present any additional arguments as to individual liability. The Court first notes that "employer" is not defined in Law 80 itself. *See* 29 L.P.R.A. § 185a–185k; *Flamand v. American Int'l. Group Inc.*, 876 F.Supp. 356, 364 (D.Puerto Rico 1994) (citing and cataloging the definitions of "employer" in other sections of Title 29 of the Laws of Puerto Rico). In analyzing whether or not individual supervisors could be held liable under Law 80, the Court in *Flamand v. American International Group, Inc.*, emphasized that the only remedy available under Law 80 is salary or wages. Therefore, the *Flamand* Court held that supervisors are not "employers" under Law 80, based on the lack of a definition of "employer" under Law 80, combined with the fact that it made no sense to have a supervisor pay wages to an employee. While Plaintiffs are not alleging that the individual Defendants are supervisors, they are nevertheless attempting to hold liable the individual employees of UPR involved in the tenure decisions. The Court is persuaded by the reasoning in *Flamand*, and finds that it can be extended to the case at hand involving individual employees of UPR. Therefore, Plaintiffs claims under Law 80 against the individual Defendants are hereby **DISMISSED.**

The only Puerto Rico Law claims that remain are those under the general tort liability statute, Article 1802 of the Puerto Rico Civil Code, against the individual Defendants. Plaintiffs Gast and Castañeyra's only remaining federal claims are for procedural due process under the Fifth and Fourteenth Amendments pursuant to

§ 1983. Plaintiffs Mandavilli and Mastrangelo have, in addition to the procedural due process claims, ADEA and Title VII sex discrimination claims. The Court does not believe the Puerto Rico Law claims for tort liability "form part of the same case of controversy under Article III of the United States Constitution" as the remaining federal claims. 28 U.S.C. § 1367(a). Thus, the Court hereby **DISMISSES** Plaintiffs claims under Article 1802 of the Puerto Rico Civil Code **WITHOUT PREJUDICE.**

Further, Dr. Mandavilli's wife, Ranga Mandavilli and the Mandavilli–Mandavilli conjugal partnership; Dr. Gast's wife, María Isabel Cubides–Camacho and the Gast–Cubides conjugal partnership; Dr. Mastrangelo's husband, Vladimir Lebduschka and the Lebduschka–Mastrangelo conjugal partnership; Professor Castañeyra's husband, Jose G. Angulo–Cuzzi and the Castañeyra–Angulo conjugal partnership, cannot maintain an action separate from that of Professor Castañeyra's action, and therefore, their claims under Puerto Rico Law are also **DISMISSED WITHOUT PREJUDICE.** *See Maldonado v. Banco Central,* 95 J.T.S. 48.

### IV. Conclusion

For the reasons set forth above, the Court hereby **DISMISSES** the following claims **WITH PREJUDICE:** (1) Satya N. Mandavilli: national origin/race/ethnic background discrimination under Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and 42 U.S.C. § 1983; (2) Laura Mastrangelo Puech: national origin/race/ethnic background discrimination under Title VII of the Civil Rights Act as amended, 42 U.S.C. § 2000e, 42 U.S.C. § 1981 42 U.S.C. § 1983; (3) Luis Gast Pineda: national origin/race/ethnic background discrimination under Title VII as amended, 42 U.S.C. 2000e, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621; (4) Carmen Castañeyra de las Casas: national origin/race/ethnic background discrimination under Title VII as amended, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and sex discrimination under Title VII, as amended, 42 U.S.C. § 2000e.

The following claims are hereby **DISMISSED WITHOUT PREJUDICE:** (1) Satya N. Mandavilli: claims under Law 80, P.R. Laws Ann. tit. 29, §§ 185a–185k, and under article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, and all claims of Dr. Mandavilli's wife, Ranga Mandavilli and the Mandavilli–Mandavilli conjugal partnership; (2) Laura Mastrangelo Puech: claims under Law 80, P.R. Laws Ann. tit. 29, §§ 185a–185k, and under article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, and all claims of Dr. Mastrangelo's husband, Vladimir Lebduschka and the Lebduschka–Mastrangelo conjugal partnership; (3) Luis Gast Pineda: claims under Law 80, P.R. Laws Ann. tit. 29, §§ 185a–185k, and under article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, and all claims of Dr. Gast's wife, María Isabel Cubides–Camacho and the Gast–Cubides conjugal partnership; (4) Carmen Castañeyra de las Casas: claims under Law 80, P.R. Laws Ann. tit. 29, §§ 185a–185k, and under article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, and all claims of Professor Castañeyra's husband, Jose G. Angulo–Cuzzi and the Castañeyra–Angulo conjugal partnership.

**SO ORDERED.**